M. Michael Potoker, J.
Starting with King Solomon’s famous decision in the first recorded custody case and down through the ages experienced jurists will unreservedly agree that child custody proceedings are the most trying, vexatious and complex of all legal proceedings. The instant matter is no exception.
In this proceeding respondent mother requests termination of petitioner father’s visitation rights because of his negative influence, deviousness and deliberate attempts to sabotage her planning for their children. The parties were married in 1960 and divorced eight years later.
Respondent claims that the father is more determined than ever to destroy and provoke the rather tenuous bond existing between the children and herself and encourages them to rebel, abscond from home and spy. She strongly urges that their interests and welfare would be better served if all future visitation were denied to their father. In opposition thereto petitioner *101 pleads for transfer of custody to him or, in the alternative, enlarged rights of visitation.
In the original custody hearing before me in February, 1971, I found that under the circumstances and upon the proof then adduced it would be in the best interests of the children that they remain in the custody of their mother with liberal visitation rights accorded to the father.
The facts as disclosed in the instant hearing are not too dissimilar to those presented to the court last year except for two abortive attempts by the children to abscond from their mother’s custody in search for refuge with their father. In March, 1971, and again on January 12,1972 Debra, now age 12, and her sister Allison, two and one-half years her junior, were picked up by police officers at the very same location in Old Westbury, approximately 10 miles distant from their home in Queens.
The children were confidentially interviewed by the court in chambers on consent of the parties and on the authority of Lincoln v. Lincoln (24 N Y 2d 270) at which time they refused any suggestion from the court that perhaps their fleeing escapade was aided and abetted by their father or some other person acting on his behalf. They insisted that on January 12 they left their school in Queens at 3 o’clock in the afternoon and walked for two and one-half hours until they were spotted by police officers in Old Westbury. By no stretch of the imagination is this court convinced that two girls, 12 and 10 years of age respectively, loaded with school books and using umbrellas part of the time to shield them from the falling rain, hiked 10 miles in the time claimed. A search of American track records discloses that the record for that distance in race walking is 1 hour, 13 minutes, 17.6 seconds held by Robert O. Laird of Walnut, California, who accomplished the feat on May 16, 1964.
Debra’s attitude toward her mother remains unchanged and her hostility seems to have increased rather than diminished. When the court again, as it and the examining psychiatrist attempted last year, tried to understand with more precision and the problems that led her to feel the way she does toward her mother, the girl was unable to give any satisfactory answer.
My impression of Debra is in every respect similar to that formed during last year’s custody proceeding and coincides in the minutest detail with the psychiatric diagnosis made by Dr. Alan M. Josephson, a qualified psychiatrist affiliated with the Bureau of Mental Health Services of the Family Court. Debra is overdramatic. Her crying is coercive rather than *102 genuine. The girl seemed to gain strength and was able to bring herself together whenever the court intimated that she should remain in her mother’s custody. Under pressure of this sort the girl reintegrated completely, stopped crying and became quite hostile. At various times she would say “ I’m going to live with my father and you can’t stop me ” or “ I’ll run away again.”
Allison is the same shy, confused, ambivalent and fearful little girl who is easily maneuvered by and susceptible to the guiles of her older sibling. She shows far less vehemence toward her mother. It was Dr. Josephson’s feeling and the court’s that Allison is certainly influenced by Debra’s decision to want to live with her father though she probably still has strong feelings of affection towards her mother.
On December 29, 1970 when Dr. Josephson first examined the parties and children he recommended to the court as follows: ‘ ‘ Debra is a head strong demanding, difficult child who wants what she wants. There is no doubt that the girl really wants to live with her father. However, it is not clear in my mind the real extent of difficulty between she and her mother despite the many accusations made by Mr. Pact which are poorly substantiated. The decision as to whether the girl should be with her father or mother is for me a very difficult one since without any real knowledge of the interaction between Debra and her mother and father no real evaluation of the situation can be made * * * An attempt was made to elicit the girl’s feelings toward her mother and her mother’s feelings toward the girl. As the exchange progressed the girl tensed up her mouth, stopped crying looking mean as could be at the mother said ‘ You’re not important, you’re just another woman.’ The girl showed great composure, much anger and an utter contempt of her mother. Mrs. Pact on the other hand seemed much more accepting than I would have imagined her to be and tried to make the girl understand that they could try and make things go. It was not my feeling that Debra would accommodate to this. It is therefore felt that the decision for the placement for Debra with her mother or father will depend more upon the legal aspects of this case than the psychiatric possibilities of the girl being harmed by going back to the mother or the advantages that would accrue from her staying with her father.”
Dr. Josephson further recommended that if custody was granted to the mother the situation especially involving Debra’s oppositional stance would be ameliorated considerably by obtaining long term therapy for the three of them.
*103 Soon after my decision the parties engaged in a running dispute in and out of court arising out of visitation. On August 13,1971 Judge Moskoit referred the matter to the Jewish Board of Guardians for inquiry and report as to its recommendations on visitation and simultaneously issued an order of protection which provided inter alia that1 ‘ neither party is to discuss their relationship between themselves with children or any litigation or aspect thereof with children,” and that “ petitioner (father) not administer, prescribe or advise medication or drugs for children without consent of respondent (mother) except in case of dire emergency.”
A current social work report submitted by the Jewish Child Care Association was received in evidence and oral testimony was given by Richard Mullen, a psychiatric social worker who prepared the report after consultation with the agency’s psychiatrist, its director of court services, a caseworker and the Hillside Hospital psychiatrist who is treating Debra. He opined that continued frequent exposure to Mr. Pact’s influence is detrimental to the children and that if his visitation rights were suspended Mrs. Pact would be able to adequately care for them. He found that Mrs. Pact too has limitations in that she is essentially weak, not strong enough to discipline the children and give them a sense of security in the face of their father’s actions.
He found Mr. Pact an unsuitable parent and opposed the transferring of custody to him. As to visitation his report continued: “ Regarding Mrs. Pact’s request for the elimination of Mr. Pact’s visiting rights, our findings suggest that although continued frequent exposure to Mr. Pact’s influence is detrimental, we believe that it Avould not be practical and Avorkable to eliminate all visits with him. Our reasoning is that Debra is extremely dependent on him; and also Ave believe that no contacts with him would lead to the undesirable idealization of him by the children Avhich AA'ould not permit for realistic modification of their on-going treatment. Therefore, in order to mitigate the father’s pernicious influence we recommend that there should be no overnight visits, and all visitation should be limited to one day, and should be daylight visits only. The children should be home before dusk. These stipulations are a reflection of the fact that we view prolonged exposure to the father as detrimental.”
On cross-examination Mr. Mullen stated that perhaps division of the children Avas preferable since he believes that Debra’s influence over her younger sister is detrimental to her and that Allison could be saved if the children Avere separated.
*104 The record is devoid of any proof that Mrs. Pact is an unfit mother. The children’s pediatrician testified that he has treated the children since 1965 and found them to be in good health. He found Mrs. Pact to be a concerned mother more so than most other mothers. Debra is doing exceptionally well scholastically nor does Allison present any serious school problem.
It appears that Mrs. Pact is unquestionably a competent parent and able to care for her children. She is sensitive to them, to their problems and their needs.
Despite his faults and shortcomings, which tend to belie his true feelings, petitioner father also appears to be sincerely interested in the welfare of the children. His present spouse impressed the investigating caseworker as a quiet woman who apparently has sincere interest in obtaining custody of the children. Their home provides an adequate, physical environment for them. It is fair to conclude that the children can be properly cared for under the aegis of either parent.
The same caseworker found that both children fared well while they lived with their father during the winter of 1970-71. She did express some doubt as to whether or not Allison was happy in those surroundings and away from her mother and friends.
To add to the problems involved the question of the younger daughter’s paternity was raised by petitioner who insists that although the child was born during his marriage to respondent the child was born to her as a result of a meretricious relationship with another male. Notwithstanding his assertion petitioner manifests a paternal interest in the younger child and seeks her custody as well. Since the question of paternity was not however raised in previous litigation between the parties including the separation and divorce the child is presumed to be the legitimate child of both parties. The presumption of legitimacy of a child of a married mother is ‘ ‘ one of the strongest and most persuasive known to the law ”, (Matter of Findlay, 253 N. Y. 1, 7.)
The issues facing the court in the instant proceeding are manifold:
1) Debra is determined to live with her father. How much weight shall be given to her expressed wish?
2) If her wish is granted shall she be separated from her younger sister or shall the latter be joined with her?
3) The custodial mother, in whose custody the children were placed by the parties themselves in a predivorce separation agreement subsequently incorporated by reference into the *105 Mexican decree of divorce and to whom custody was again granted in a habeas corpus proceeding in February, 1971, has done everything decent and possible to properly care for them. Shall she be denied continued custody because of her former husband’s determined efforts to destroy the relationship of mother and child to accomplish his objective?
4) Shall custody of the children be denied to either parent in favor of their placement in institutional or foster parent caret
5) Shall visitation be denied to petitioner father or shall it be enlarged and to what extent shall visitation be granted to the noncustodial parent?
Custody law has evolved in a complete cycle from the English common law where the father’s absolute right of custody of his minor children was recognized, since he was regarded as the natural guardian, to the present time where statutory reform, changed social conditions, and the family and social role of modern women have uplifted the status of the mother and placed her on an equal footing with the father.
Statutory law has firmly shored up the principle of parental equal rights. Sections 70, 81 and 240 of the Domestic Delations Law all provide that there shall be no prima facie right to the custody of the children in either parent with the best interest the primary consideration. Yet in about 90% of the eases custody of the children is awarded to the mother except in extreme cases of maternal unfitness — and in all in the name of best interest.
Custody is perhaps the most critical phase in the growing pains of a child’s life and should not provide an arena where parents will engage in an unenviable contest of undermining the child’s love for the other parent. It is precisely to that point that Judge Cardozo addressed himself in the celebrated case of Finlay v. Finlay (240 N. Y. 429, 433-34) when he enunciated his “ best interests ” rule as follows: “ The chancellor in exercising his jurisdiction # * * does not proceed upon the theory that the petitioner, whether father or mother, has a cause of action against the other or indeed against any one. He acts as parens patriae to do what is best for the interest of the child * * * He is not adjudicating a controversy between adversary parties, to compose their private differences. He is not determining rights ‘ as between a parent and a child ’ or as between one parent and another * * * Equity does not concern itself with such disputes in their relation to the disputants. Its concern is for the child.”
The cardinal rule of custody law is now well established that the court must be governed above all by a concern for the best *106 interests or welfare of the child. In all cases there shall he no prima facie right to the custody of the child in either parent, and as criteria for custody awards set forth as justice requires, having regard to the circumstances of the case and of the respective parties and to the best interests of the child. (Domestic Relations Law, §§ 70, 81, 240, supra; Finlay v. Finlay, supra.)
‘ ‘ In determining what is for the best interest of the child here involved, in the circumstances of this case, it would be most helpful to know under what conditions he is now living, how he is being cared for, and by whom he is being cared for. ’ ’ (People ex rel. Chickering v. Chickering, 31 A D 2d 910-911).
Questions of custody are generally for the court in its discretion, but that discretion is not an absolute or uncontrolled one (People ex rel. Portnoy v. Strasser, 303 N. Y. 539; People ex rel. Destasio v. Perrusza, 277 App. Div. 996; People ex rel. Charbonneau v. Charbonneau, 34 A D 2d 1034). Discretion should encompass a full and incisive review of the facts adduced including the social, spiritual, psychological and economic conditions prevailing at the alternative environments (Nelson v. Grissom, 152 Col. 502; Matter of Mittenthal v. Dumpson, 37 Misc 2d 502).
To guide the court in cases of this kind psychiatrists, psychologists and trained social workers should be consulted and their findings given serious consideration.
“ When the court seeks independent evidence, it releases itself from the shackles of partisan advocacy and opens the door to the introduction of objective evidence which may be detrimental to either or both parents but beneficial to the child. ’ ’ (A Child’s Right to Counsel in Custody Cases: Inker and Perretta, 5 Family L. Q., p. 111).
In her lecture on the Rule of Law and the Role of Psychiatry at Johns Hopkins University, published by the school’s press, Judge Justine Wise Polieb, Senior Judge of the Family Court in the State of Hew York, stresses this point very heavily on page 111: “ Judicial decisions following battles between parents for custody of children rarely give evidence of adequate help from the psychiatric profession in evaluating the effects of separation on children, their conflict in loyalties, or their emotional needs at different stages in their development. Contrary to English tradition, which bestowed on the father an all but absolute right to custody, the presumption in this country is that children especially if very young, should reside with their mothers. The rebuttal of this presumption is based too oftem not on the welfare of the child but on a further unspoken premise *107 that the determination of custody should reward innocence or punish immoral conduct.”
To avoid the pitfall of balancing the rights of either parent in total disregard of the best interests and welfare of the children the court did reach out for guidance of the psychiatric, psychological and social work professions and seriously considered their reports and conclusions yet always mindful that the ultimate decision must be made by the court.
In transferring custody from one parent to another, the court must be aware of the child’s need for stability in the home in the early years of his developing personality and through his formative years. Psychiatrists maintain that stability is practically the principal element in raising children. A child can handle almost everything better than he can handle instability. Shuttling children between parents is therefore not to be looked upon with favor if stability is an important ingredient in the development of a child.
The overriding consideration of the child’s welfare dictates that a continual shifting back and forth of custody should be avoided whenever possible (Matter of Wout v. Wout, 32 A D 2d 709; Matter of Lang v. Lang, 9 A D 2d 401, affd. 7 N Y 2d 1029).
Yet we cannot deny that time does bring about changes in a person’s lifetime and more so during his infancy and formative years. A child’s needs are in a constant state of dynamic alteration. They change with age and in response to daily experiences. Plans for children must keep these changes in mind. (The Children of Armageddon: Problems of Custody Following Divorce — Dr. Andrew Watson, 21 Syracuse L. Eev. 55, 70-71.)
If a child’s needs change as time goes along, then courts of law must be ever alert to the fact that orders of custody must likewise be flexible and courts should not hesitate to modify custody where the exigencies of the case so demand.
While an award of custody is always subject to modification or change if conditions of the requirements of the children so warrant (Lefkon v. Lefkon, 267 App. Div. 836), the change of circumstances or requirements must be material (Kirby v. Kirby, 246 App. Div. 532) and should be used sparingly and under extraordinary circumstances.
If the balancing of equities between parents were the determinative factor in deciding child custody cases, petitioner’s application for change of custody would be denied since Mrs. Pact is doing her utmost to adequately care for the children even in the face of opposition from the children and their father. *108 But as we stated earlier a custody hearing should not he relegated to a contest between parents bent on victory for each other at the expense of the welfare and future happiness of their children.
Petitioner readily admits to encouraging the children to rebel against their mother but he attributes his action solely to his sympathy for their strong and unwaivering desire to live with him. He joins them in pleading for their custody.
In the absence of any grave disability such as the unfitness of a parent, a child’s preference will be given paramount consideration if it further appears that her best interests, welfare and development will be improved by awarding custody to the preferred parent.
The court should interrogate the children as to their experience in the mother’s home and elicit their wishes as to the place in which they would prefer to live (Gallaher v. Bencene, 27 A D 2d 690).
The expressed wishes of a child, provided it is of sufficient age and understanding, as to the parent in whose custody it desires to be placed, are a factor taken into consideration by the court in determining the child’s custody as between contesting parents. (2 Foster and Freed, Law and the Family, § 29:12; People ex rel. Norwood v. Coffey, 12 A D 2d 579; Kesseler v. Kesseler, 10 N Y 2d 445.)
However, the weight to be given the preference is within the discretion of the trial court and may be disregarded altogether. It is not, in the final analysis, controlling (People ex rel. Brussel v. Brussel, 280 App. Div. 784; People ex rel. Glasier v. Glasier, 2 A D 2d 289; Matter of Kendrick v. Kendrick, 32 Misc 2d 938) and will not bar the court from making a contrary determination in the best interest of the child (People ex rel. Geismar v. Geismar, 184 Misc. 897; People ex rel. Fields v. Kaufman, 27 Misc 2d 625).
The court stated in Hahn v. Falce (56 Misc 2d 427, 435) that: “ Any other policy would be practically to abandon the jurisdiction of the court and make the child the sole judge of his own best interests and welfare (People ex rel. Glendening v. Glendening, 259 App. Div. 384, 392, affd. 284 N. Y. 598).
In Matter of Alaimo (36 Misc 2d 759) the child’s preference to live with her father was ignored where the mother had taken good care of the child.
In Matter of Barry v. Glynn (59 Misc 2d 75) custody of an 11-year-old child was transferred from her mother, with whom she lived since age four, to her father with whom she preferred *109 to live. Judge Midonick, coupling her welfare with due process, reasoned as follows {supra, p. 76): “ All statutes and decisional law must afford justice to this child as she grows older and her environment and needs may change with the passing years. To afford less to this child by adhering with rigidity to her custodial status fixed at the age of four, when she is now 11 and if her best interests require a change, would be to impair her welfare which is the paramount concern of this decision as to her custody. Neither res judicata nor full faith and credit, nor the contract her parents made shortly before their divorce, can impair her due process right to a change of custody from one parent to the other, when her welfare requires a change. (Matter of Adams v. Rhoades, 56 Misc 2d 249; Domestic Relations Law, § 240.)”
However, where the stated preference is deemed to have been inspired by pressure or “ brain washing ”, it will not be given any weight. (People ex rel. Geismar v. Geismar, 184 Misc. 897, supra.)
“ At least where the pertinent factors are evenly balanced, the child’s wishes should be decisive unless the person chosen by the child is obviously unfit or the child’s choice is the result of coercion or bribery. Where the child’s attachment to one parent is intense, severe damage may result from awarding custody * * * to the other. Whenever a child indicates a strong preference, the court should thoroughly study not only what is best for the child’s psychological welfare but also what effect custody and visitation rights will have on his emotional and mental health. Where there is a professional staff, this matter should be fully explored. An interrogation by the judge in chambers is no substitute for a thorough psychiatric report.” (Foster and Freed, Child Custody, 39 N. Y. IT. L. Rev. 423, 443).
To what extent is the children’s desire to live with their father in response to his emotional seductiveness, or based on a real, justifiable repulsion to their mother f
After carefully reviewing all of the evidence adduced including the findings of the psychiatrists and the social workers the court is now firmly convinced of Debra’s strong and unyielding desire to reside with her father even absent the incidents of his encouragement and inducement. The desire to live with her father has increased rather than diminished during the past year as evidenced by her constant refusal to accommodate her mother and the two attempts of absconding from her home. She does not appear to be motivated toward making any type of adjustment in regard to her mother psychotherapy notwithstanding.
*110 ‘ ‘ It may be rash for a court to disregard the preference of a child old enough to form a rational judgment because its choice may be the result of experience rather than a conclusion based on the legally admissible evidence the court has heard.” (2 Foster and Freed, Law and the Family, § 29:12).
The prevailing opinion of the psychiatrists and social workers who examined the parties and the children is that the older child would not be affected psychologically if she was permitted to reside with her father. Even Mr. Mullen, the Jewish Child Care Association psychiatric social worker who was most critical in his evaluation of petitioner, indicated that the child is extremely dependent on her father.
The Law Guardian, who represented the children during the hearing, indicated that she too believes that the sisters should be separated although she looked askance at the thought of Debra being awarded to petitioner.
Under all the circumstances the court finds that as to Debra there exists a clear showing of a substantial change of circumstances to justify modification of the existing order of custody. Debra has consistently maintained her desire to live with her father. The record discloses that her father and his present spouse, with whom the girl relates, can adequately provide for her and her needs. It would be foolhardy therefore to remove her from her mother’s home and place her in institutional or foster parent care for again we would instinctively fall into the trap of punishing the father rather than concerning ourselves with the child’s welfare. The girl deserves a chance to prove to herself that she can make it with her father and the court is inclined to give her that chance.
What of the younger sister Allison whose attitude toward her mother is far less contemptuous and appears to be at most ambivalent? Unlike Debra she has not been a problem to her mother. Her ambivalence is no doubt attributable to the influence exerted by Debra though she still has strong feelings of affection toward her mother. She is well liked and enjoys the companionship of her contemporaries in her home area. Her previous experience of living with her father for approximately six months left her more confused and apparently far from happy. There does not seem any justification for again disrupting her home stability at this time.
Division of the siblings between the parties seems to furnish the only sensible answer to their continued welfare. It is desirable from every viewpoint and unqualifiedly meets the best interests and clear necessity doctrine formulated by the courts.
*111 Having determined that the interests of the children would best be served by a change of custody we must explore the psychological effect the separation of the sisters and their division between their parents would have on them. Dr. Nichturn, chief psychiatrist of the Jewish Child Care Association, to whom the court turned for professional guidance on this question advises that no psychiatric examination could determine the future psychological risks on the children if they were separated.
Dr. Oscar Pelzman, a qualified psychiatrist who treated the children during the six months of their residence with their father in 1970-71, urged that it would be bad psychologically for Debra to return to her mother. Significantly he made no similar assertion as to Allison.
If at all possible, it is assumed that children should be reared together, rather than partitioned off, unless there is a clear necessity that separate custody be awarded due to the circumstances of the parties. (See People ex rel. Borella v. Borella, 21 A D 2d 871; Matter of Lang v. Lang, 9 A D 2d 401, supra; Brown v. Brown, 218 Ark. 624; Brashear v. Brashear, 71 Idaho 158; see, also, People ex rel. Moody v. Moody, 36 A D 2d 627, wherein the son was awarded to the father and the daughter to her mother.)
The court psychiatrist found that the children are not as close as it would appear. Debra is two and one-half years older and they do not share the same companions. From all of the evidence adduced the court believes that Allison’s best interest would be served if she remained with her mother and free from the manipulative acts of both her sister and her father.
The court directs as follows:
1) Effective March 17, 1972 custody of Debra shall be transferred to petitioner father under court supervision for one year and on further condition that the child be continued in psychotheraphy at petitioner’s expense. Because petitioner resides in Suffolk County the Probation Department of that county is requested to conduct the supervision and to furnish to this court semiannual progress reports.
2) Custody of Allison shall remain with her mother under court supervision for one year. The Probation Department is requested to submit a semiannual progress report to the court.
3) Petitioner may avail himself of visitation rights with Allison on the last Sunday of each month from 9:00 a.m. to 7 p.m. beginning April 30, 1972 outside respondent’s home.
4) Petitioner is cautioned to observe to the letter of the law *112 all of the terms of the order of protection in effect at this time. His custody and visitation rights are preconditioned on observance of said order of protection.
5) Respondent is accorded visitation rights with Debra on the first and third weekends of each month from 11:00 a.m. Saturday to 6:00 p.m. Sunday beginning Saturday, April 1, 1972. Petitioner shall produce and pick up child at respondent’s home at the required hours.
For legal services rendered the attorney for the respondent is awarded $1,000 which petitioner is directed to pay directly to him in two equal installments of $500 on April 1 and May 15 (Family Ct. Act, § 651; Domestic Relations Law, § 237, subd. [6]).