Jacob T. Zukerman, J.
How difficult it is for a court to decide what is in the best interests of a child is illustrated by this custody proceeding involving the natural parents and a couple who have acted as good foster parents without permission of the court.
On August 27, 1970, the Bureau of Child Welfare brought a neglect petition against the mother Catherine S., alleging that the children — Catherine Jr., born December 6, 1966, and Darlene, born April 15, 1970 — were neglected children because the respondent mother was- a drug user, and because the younger child was born with withdrawal symptoms and because the mother had abandoned the children, leaving them with her sister Angelina W. on July 7, 1970. A warrant was issued for the mother, and the children were paroled to the maternal aunt.
Subsequently, on September 16, 1970, since the mother could not be located, an inquest hearing took place and a finding of neglect was made without prejudice. Both children were placed with the aunt. No further action took place until July 25, 1972 when the mother filed a petition to terminate placement, alleging that Catherine Jr. had been returned to her but that Darlene was still in the custody of Angelina W. She alleged also that she was in a methadone program and was able to provide proper care for both of her children. Shortly thereafter, on August 24, 1972, Angelina filed a petition for change of placement of Darlene to a Mr. and Mrs. Robert B. with whom she had left Darlene 18 months before and who had taken care of her since then. The B’s appeared in opposition to the mother’s petition. By that time it was clear that the placement of the children had actually terminated and all parties consented to treating the situation as a custody proceeding as to the child Darlene. It is also developed that Angelina W. was not really a sister of the mother, but had merely so indicated, allegedly on the advice of the welfare worker, so that the children would not be sent to the Commissioner of Social Services. It became clear too, that the father of the children, Vincent S., who at the time of the neglect finding in September, 1970 had been *156 in prison, was now at home with the mother and the child Catherine Jr., who had been returned to the mother.
There is no question that the child Darlene has been very well cared for and is in excellent health. The B’s are a fine couple, well able to take care of the child, and willing to continue to do so, although they are not in any way related to her.
On consent of the parties, both parents and Mr. and Mrs. B. were seen by the court’s Mental Health Service. The court psychiatrist’s report indicated that the B’s were fine people, fully able to continue to provide a good home for the child. He felt that the mother ‘ ‘ has little emotional response to offer a child at the present time and it is felt that she cannot benefit her daughter at this time ’ ’. As to the father, he stated ‘ ‘ he is in need of therapy and is not adequate to give emotional support to dependent at this time.”
On the other hand, testimony given by Myra Shultz, Clinic Instructor in Psychiatry at Downstate Hospital Medical Center, who has been working with the parents for the last six months as their primary counsellor in the Kings County Hospital methadone maintenance program where the couple have been treated since October, 1971, was to the effect that the parents could adequately care for Darlene as they had been doing for Catherine Jr. She indicated that both parents had made unusual progress and are one of the few couples that are both almost completely detoxified.
The court found from the testimony given by the parents that they are being supported by public assistance while the father has been attending New York University in precollege courses; that he will enter Hunter College in the fall semester as a matriculated student; that he is being subsidized by grant for this education; that he hopes to become a social worker in the field of drug addiction.
The mother testified that because she had been a drug addict she allowed Angelina W. to care for both children while she went to the hospital for treatment, that she became motivated for treatment when she realized that Darlene was born with withdrawal symptoms; that she took Catherine back when she left the hospital but continued to leave Darlene with Angelina because she felt, at that time while on methadone, unable to provide proper care for the baby; that she did not know the baby had been turned over to the B’s and learned of this only when she tried to recover the baby. She testified further that she was about to give birth to a third child and was going into *157 the hospital that very evening for induced delivery. She felt that she and her husband could provide a good home for Darlene as well. She admitted she had been previously married and divorced and that the two children of that marriage were living with their paternal grandmother in New Jersey, but claimed she visited them about every week.
The father admitted he had served 16 months in Sing Sing and before that for five years from age 17 to 23, that he had been a heroin user but had not used heroin for over two years and that he had used only methadone since, that he expected to complete the program in the spring but to continue counsel-ling ; that he hoped to become a worker in the field.
Based on stipulation, the court admitted into evidence the reports of the New York City Department of Social Services as to visits to the parents’ home. These showed excellent facilities and suggested no problems that might adversely affect the child’s welfare.
What developed from the testimony was this question. While there is no question that the child is very well cared for in the home of the B’s with whom the child (now almost three years old) has been for the last one and one-half years and that they could continue to provide an excellent home for her, should they be allowed to keep her in the face of the demand by the parents that she be returned? Are the parents entitled to the immediate return of the child because they are the natural parents regardless of the effect of such return upon the child?
The petitioner cites as authority People ex rel. Kropp v. Shepsky (305 N. Y. 465), People ex rel. Scarpetta v. Spence-Chapin Adoption Serv. (28 N Y 2d 185), Spence-Chapin Adoption Serv. v. Polk (29 N Y 2d 196), for the proposition that, without a finding that the natural parents are presently unfit, this court is without option and must return the child forthwith. Yet this court agrees with the reasoning and position recently taken by Justice Nadel in People ex rel. Rothman v. Jewish Child Care Assoc. (N. Y. L. J., Nov. 1, 1972, p. 17, col. 2 [Sup. Ct., N. Y. County]) that the cases cited above do not hold that, without a finding of unfitness of the natural parents, the court may not consider the child’s well-being, and that the child must be ordered immediately returned.
As Justice Nadel noted, the Court of Appeals in Spence-Chapin Adoption Serv. v. Polk (supra) reviewed the leading cases on the subject. It reaffirmed that the primacy of parental rights may not be ignored and that a dispute between a parent and a nonparent may not be resolved by simply determining *158 which party can provide or afford the better surroundings in order to raise the child. As stated by the Court of Appeals (p. 204): “ ‘ In other words, the burden rests, not, for instance, upon the mother to show that the child’s welfare would be advanced by being returned to her, but rather upon the non-parents to prove that the mother is unfit to have her child and that the latter’s well-being requires its separation from its mother. ’ (305 N. Y. at 469). Of course, this does not mean that the child’s rights and interests are subordinated.”
If we are not to completely subordinate the child’s rights and interests we must also consider his emotional well-being and the effect of an immediate or even eventual return to the natural parents.
As has been correctly observed and stated, the determination of what is in the best interests of the child, based upon the self-serving testimony of the parties and their friends, places a difficult burden on the Trial Judge (Foster & Freed, 39 N. Y. U. L. Rev. 423 [1964]). Often what is in the best interests of the child may not be introduced by the parties because their interests are likely to diverge from those of the child. Thus, the choice between the possibility of inflicting harm upon a mature, responsible adult or a helpless child seems clear. The Judge acting for the State as parens patries is responsible for protecting the interests of the children which come before him and thus, so to speak, for representing them.
In Matter of Mittenthal v. Dumpson (37 Misc 2d 502 [Family Ct., 1962]), the petitioner’s attorney was careful to introduce testimony that the mother there was no longer unfit in the sense that she had been when she was hospitalized. Nevertheless, the court held (p. 511) that for “this child at this time [the] mother continues not to be fit to care for this child, in that she would be unable to avoid causing him to suffer 1 neglect ’ and detriment to his welfare because of the clash of their personalities ”.
The extensive works of notable psychoanalysts such as Erikson, Bowlby, and Anna Freud have established that “the mutual interaction between adult and child, which might be described in such terms as love, affection, basic trust, and confidence, is considered essential for the child’s successful development, and it is the basis of what may be termed psychological parenthood. It is this psychological parenthood, rather than the biological events which may precipitate such a relationship, which many psychologists identify as the sine qua non of successful personality development. # * * After a *159 period of separation from the biological parent and care by a third party, the child may learn to look upon the latter as his psychological parent * * * Where this has happened, a change in custody based solely on biological relationship might, by disrupting the existing relationship of psychological parenthood, work considerable emotional harm upon the child.” (73 Yale L. J. 134, 158 [1963]). In regard to this latter point it is significant to note that the New York State Legislature in enacting subdivision 3 of section 383 of the Social Services Law has provided that “ foster parents having had continuous care of a child, for more than twenty-four months, through an authorized agency, shall be permitted as a matter of right, as an interested party to intervene in any proceeding involving the custody of the child.” Furthermore, section 611 of the Family Court Act recognizes a child to be permanently neglected if the natural parent failed for a period of more than one year, following the placement of the child in the care of an authorized agency, to substantially and repeatedly maintain contact with and plan for the future of the child. Although neither of these provisions is applicable in the case at bar, for we are not dealing with an agency placement, they are significant in that they demonstrate a recognition on the part of the Legislature of the effect of the passage of time (of one or two years) upon the welfare of the child who has lost contact with his natural parents.
It is because of these considerations (the emotional well-being of the child) that the court must not make an automatic decision based upon the isolated factor of the natural parent’s fitness. *■1 The concept of unfitness and neglect must be viewed with more flexibility when custody is involved, as distinguished from permanent termination of parental rights ”, as seemed to be involved in the Spence-Chapin and Kropp eases (Matter of Mittenthal v. Dumpson, 37 Misc 2d 502, 512, supra). Furthermore, in none of those cases was there presented a prior finding of neglect by a court of competent jurisdiction.
Although New York has been more oriented toward the principle of “parental right” (that natural parents should be deprived of custody only where unfit), other jurisdictions, increasing in number, have already recognized and now emphasize that it is “the best interests of the child” which are determinative. The latter approach has been viewed by many commentators to be “ clearly in accord with the philosophy and social interests predominant in the twentieth century.” (Foster & Freed, Child Custody, 39 N. Y. U. L. Bev. 423 [1964]; Custody of Minor Children, 7 Family L. J. 81 [1967].)
*160 In the noted case of Painter v. Bannister (258 Iowa 1390 [1966], cert. den. 385 U. S. 949 [1966]), a natural father sought to regain the custody of his son who, at the time of the court decision, had been living with his grandparents for two and one-half years following the death of his mother. Although the court found the natural father to be ‘ ‘ fit ’ it nevertheless refused to interrupt a satisfactory ongoing parent-figure child relationship indicating that its determination was founded upon what would be in the best interests of the child. The court stated (p. 1400), “We do not believe it is for Mark’s best interest to take him out of this stable atmosphere * * #
and send him to an uncertain future in his father’s home. Regardless of our appreciation of the father’s love for his child and his desire to have him with him, we do not believe we have the moral right to gamble with this child’s future.” Similarly, the court in Root v. Allen (151 Col. 311, 316 [Sup. Ct., 1962]), asked and answered the following question in the negative: “ Is the natural father, once he shows beyond doubt that he is a fit and proper person to have custody of his child, in law entitled to restoration of the child to him even though the court in its findings * * * determines that to give him custody would not be in the best interests of the child? ”
In Oehlers v. Oehlers (495 P. 2d 236, 237 [1972]), the Court of Appeals of Colorado recently refused to transfer custody from a grandparent to the natural father although the latter was found to be fit. The court indicated that “ the underlying rationale behind preferring natural parents as custodians must arise from a societal concern for the best interests of the child.” It is the duty of the court “ to determine what terms and provisions would best guarantee an opportunity for the child to grow into mature and responsible citizenship.” Likewise, the Supreme Court of Washington in Matter of Palmer v. Palmer (81 Wn. 2d 604, - [1972]), held that in cases where natural parents who have lost custody of their children seek to have custody restored to them, “ the welfare of the child is the only operative standard * * * and all other considerations are secondary.” If this were not the rule, there is danger that children would be regarded as mere chattels to be given to the winner of an adversary proceeding.
The Washington court acknowledged the fact (p. -) that “ the nature of parenthood is such that in most instances the parents of the child will be most likely to best provide for its welfare [; that] natural family relations [are] favored, and parental affection is an element of priceless advantage to the *161 child.” The court, however, did recognize that “the function of parenthood is not purely a matter of biology. Persons other than natural parents may occupy the relationship of parent to the child.”
In Webb v. Webb (264 So. 2d 925, 927 [Ct. of App., 1972]) the Louisiana court stated that “ although parents have a natural right to the custody of their children, nevertheless the State has an interest in children which goes beyond the parental right. In all cases involving their custody, the welfare of the children must be considered and should prevail over the mere parental right of their possession.”
Finally, it is worth briefly noting the position taken by the court in Coulter v. Coulter (141 Col. 237, 241 [1959]). The court stated that although “the natural parents have a first and prior right to custody, we do not interpret it as requiring that custody be awarded to the parent or parents merely because the evidence shows fitness and ability to care for the child. The controlling factor * * * is the welfare of the child.”
Recognizing and applying the ‘ ‘ best interests of the child ’ ’ principle would not be a unique approach for New York courts to take. In 1925, Judge Caedozo stated, in regard to a dispute between natural parents over the custody of their child, the best interests theory. (Finlay v. Finlay, 240 N. Y. 429, 433-434 [1925].) “The chancellor in exercising his jurisdiction * ° does not proceed upon the theory that the petitioner, whether father or mother, has a cause of action against the other or indeed against any one. He acts as parens patrice to do what is best for the interest of the child * * * Equity does not concern itself with such disputes [over custody] in their relation to the disputants. Its concern is for the child.”
Clearly, the approach of the court must not be any different when the issue of custody arises between parents and non-parents, under circumstances such as those involved in the case at bar. The interests of the child become no different. Any distinction in the treatment of the two situations today can only be based on antiquated assumptions inherited from feudal law that a parent has the same possessory interests over a child as he does over some sort of chattel.
Blind adherence to a parental right approach inhibits adequate consideration of the best interests of the child, which must be viewed as the primary concern of the law. All too often there is a conclusive presumption that the child’s wel *162 fare requires that custody be awarded to the “fit” natural parent as against the nonparent. Such arbitrary rules can be no substitute for careful inquiry and a thorough investigation of the facts. It is often the case that the issue of a party’s fitness obscures the paramount issue of the child’s welfare. (Cf. Foster and Freed, supra.)
Having enunciated the ‘ ‘ best interests of the child ’ ’ approach, in regard to disputes over child custody, this court does not deny that in general such interests of the child will be fur- ' thered by having him reared by his natural parents. This court would like nothing more than to see this family reunited as soon as feasible. Because of the circumstances involved in this case, however, the court is unwilling to risk the welfare of the child by granting a change in custody without first establishing that the child will not be emotionally damaged thereby.
In this case, the court is troubled by the possibility that this child, who really does not know her parents, may have difficulty in adjusting to a new home situation, particularly at a time when there is a new baby in the house and while the parents, in spite of the wonderful progress they have been making, are still not completely rehabilitated. The court is also concerned that the additional pressure of having the child in the home may create some problems for which the parents may nob, be fully prepared. Yet we feel that the parents should be encouraged to continue making progress and that there should be a return of the child within a reasonably short period.
Accordingly, the child Darlene is continued temporarily in the custody of the B’s until June 15, 1973. During this period, the parents shall have the child stay with them each weekend from Saturday noon to Sunday at 6:00 p.m., the mother to pick up and return the child. I direct further probation investigation, including visits to the home of the parents for report to the court on the adjourned date. If the reports indicate no adverse effect upon the child, the court plans to turn custody over as of that date to the parents for a period of about six months with continuing supervision by the probation department and a report to the court prior to final disposition.
The court recognizes that this will require continued co-aperation of the B’s who have always evinced a wonderful concern for the child. I would hope that the B’s would wish to continue contact with the child and that the parents, who I believe are grateful for the devotion the B’s have exhibited, will make every effort to provide such contact,