Edith Miller, J.
Susan Spencer lived with her natural mother from the time of her birth on June 6, 1966, until March 15, 1969. At that time, her mother, Phyllis B., having been abandoned by Susan’s father, took Susan and her three brothers to the 83rd Precinct in Brooklyn. Miss B. had given birth to four children in six years and found herself unable to cope with this overwhelming responsibility alone. She subsequently signed a voluntary commitment and the children were placed in foster care with the Commissioner of Social Services. From March, 1969 until September, 1970, Susan lived in the McMahon Memorial Shelter, a temporary shelter for children.
During the summer of 1970, Beverly A., a teacher in the New York City educational system, worked at McMahon. Susan was in her group and Mrs. A. became quite fond of her. She brought Susan to her home on weekends and her husband, Howard A., *558 also a teacher, encouraged the relationship. Thereafter, application was made and granted for Mr. and Mrs. A. to become foster parents to Susan. In September, 1970, the McCloskey School and Home for Children became the agency charged by the Commissioner of Social Services with the responsibility for the supervision of the foster care of Susan and with planning for her welfare.
Susan has been residing with the foster parents and their 16-month-old son since September, 1970. She has her own room in a private house in Pelham, New York, together with all the comforts of middle-class living. Susan attends an excellent public school and is in good health. The foster parents have unquestionably provided her with a good home life and a high quality of parental love and concern.
At this time, the natural mother wants to assume full-time responsibility for Susan and the agency concedes that she is ready and able to meet this responsibility. However, it is the contention of the foster parents that reunion with the natural family is premature at this time, and that Susan should be permitted to remain in their home.
On June 8,1973, pursuant to section 392 of the Social Services Law, a hearing was held, which was continued on June 20, 1973, to adduce proof as to what is. in the best interest of the child. All parties, including the child, were represented by counsel. To support their contention that the child should continue to remain in foster care pursuant to section 392 (subd. 7, par. [a]) of the Social Services Law, the foster parents called, as witnesses, the school psychologist and Susan’s kindergarten teacher.
According to the testimony of the teacher, Susan entered kindergarten in September, 1971, at the age of five years. At • that time, her listening skills were poor; she was unable to function in a group setting and was unable to make friends. She was given considerable individual attention by the teacher and a speech therapist, and began, thereafter, to show improvement. Susan was retained an additional year in kindergarten in order to consolidate the gains she had made socially bef ore going on to the academic demands of first grade in September, 1973.
The teacher further testified that Susan continued to do well until April, 1973, when plans were formulated to return her to her natural family. Thereafter, she began “ acting out ” in class again, leading the teacher to conclude that remaining with the foster parents and within the present school system would be in the child’s best interests.
The school psychologist corroborated the testimony of the teacher and also recommended that Susan remain with the foster *559 parents, where she could receive special attention from them and from the school.
The foster parents testified that, after home visits commenced in preparation for reunion with her family, Susan started bed-wetting again and commented that they were trying to get rid of her now that they had their own baby. They stated that Susan did not welcome weekend visits with her family. They further testified to the social gains that Susan had made in her present environment where she felt secure and loved and stated that the child was not ready at this time for change.
Susan’s natural mother left New York City in 1970, and relocated in Highland Falls, New York, where she felt she could make a better life for her children. She is presently residing in a five-room apartment on the upper floor of a two-family home. The house is owned by her fiance’s sister and her husband. The mother and her fiancé, Anthony M., live in said apartment together with their daughter Donna, born in March, 1971, and the mother’s two olde,r sons, Fred 12 and Stephen 10. The boys were returned to their mother by the agency in June, 1972.
The court finds from the uncontroverted testimony given by the mother, her fiancé, and the case workers from Cardinal McCloskey, that no special social problems have arisen in the year that the boys have been home. They are in good health and attending school regularly and get along well with their younger sister Donna, who is also well cared for. Mr. M. intends to buy a house for the family and has recently received confirmation from the United States Department of Agriculture, Farmers Home Administration, that he is eligible for rural housing assistance. With their help, he anticipates that he will be able to improve the housing situation for the family. In the meantime, he plans to convert the dining room into a bedroom for Susan and to remodel the kitchen so that- the family can dine there instead. The agency approves this plan -and the court has been assured by the Department of Social Service’s attorney and the agency that the discharge grant can be used for this purpose.
The Law Guardian, who represents Susan, has visited the home in Highland Falls and met all members of the family. He has no objection to the return of the child if suitable sleeping arrangements can be made for her. He recommends that, with careful planning, the optimum time for reunion would be over the summer vacation.
Miss McM., Susan’s foster care caseworker for the past two years, has testified that she is the worker responsible for picking Susan up at the home of the foster parents in Pelham and driving her to the. home of her natural family in Highland Falls. *560 Her testimony corroborates that of the natural mother, that Susan has responded positively to the weekend visits and to the eight-day visit during Easter vacation.
Mr. D., the family caseworker, assigned by the agency to work with the family, has testified that he finds the mother and her fiancé competent parents in their relationships to the children presently living in the home, and recommends that Susan be added to the present existing family structure.
Mr. M. testified that he has a separation agreement and that he wants a divorce, but that financial limitations prevent him from obtaining a divorce (he is a laborer earning a gross income of $130 per week). He further testified that he wants a divorce so that he can marry Phyllis B., the natural mother.
Ordinarily, this court would have misgivings in returning a child to a household where the adults are not legally married, but the court has been persuaded by the testimony of the natural mother, Mr. M. and the case workers that this union is a stable one. At a time when an ever increasing number of children are being abandoned throughout the United States each year, Mr. M. has voluntarily undertaken a financial and emotionally supportive role with respect to the mother and her children. He has stated his willingness to share responsibility for all of the children and to plan for the welfare of the family.
It is therefore ordered, upon the consent of Mr. M. and the agency, that the agency provide legal services to enable Mr. M. to obtain a divorce, if no free legal services are available in the community.
The court has seriously considered the conflicting testimony concerning Susan’s reactions to returning home, and finds that it is not unusual for a child of Susan’s tender age to experience some anxiety and conflict about leaving a familiar environment. However, the court notes that the school problems described by the teacher and schobl psychologist were primarily behavioral and not deeply rooted emotionally as evidenced by the fact that the school used socialization techniques in handling them rather than referring Susan to a pediatrician, neurologist, and/or p sy chotherapi st.
The natural mother has a limited education, lacks financial means and suffers by comparison with the educational and financial resources of the foster parents. However, she has had a continuing interest in her children and has manifested that interest by visiting them in placement and planning for their welfare with the agency. No evidence has been presented that the mother is unfit to care for the children. The court has been favorably impressed by the efforts of the agency to encourage *561 and strengthen the parental relationship and to assist the mother in realistic planning for the welfare of her children. The reunion of the four children with the mother has been planned to occur over a two-year period so that the mother could gradually acquire the necessary strengths needed for successful parenting.
The court is fully aware that in this case, as in countless other cases, returning the child to the natural family seriously affects the material well-being of the child. The needs of the child remain the same, but public welfare standards provide payments to the natural family substantially below that provided for foster children. However, the Appellate Division in People ex rel. “ PP ” v. Sackey (40 A D 2d 130 [1972]) decided that there is a presumption that the best interests of the child are served by returning it to its natural parent. In struggles between the natural parent and some other person, the presumption cannot be overcome except for the gravest reasons, such as where the parent has abandoned the child or is unfit.
Therefore, for this court to deprive the natural mother of being united with her child at this time when the mother, the agency, the Department of Social Services and the Law Guardian believe that she is capable of assuming this responsibility would defeat the purposes of the foster care program. It would discourage parents from turning to professional and reputable agencies in times of family crisis, knowing that their modest resources could never compete with the resources available to the foster home. The better course for the court to take would be to encourage parents under stress to participate in foster care programs in order to avoid possible child abuse situations.
In view of all the foregoing, the court finds pursuant to section 392 (subd. 7, par. [b]) of the Social Services Law, that it is in the best interests of Susan to be returned to her mother as soon as the agency has ascertained that suitable sleeping arrangements are available for the child* within the present apartment.
It is further ordered pursuant to subdivision 9 .of section 392 of the Social Services Law, as amended, that the agency continue to provide casework services to strengthen this family and in particular to assist them in obtaining adequate housing and psychiatric treatment if it becomes necessary.
This case is to be recalendared on December 27, 1973, for a progress report in respect to Susan’s adjustment at home, at school and in the community. The court will retain jurisdiction until that time pursuant to subdivision 10 of section 392 of the Social Services Law. All parties are to receive notice of this date including the foster parents.