Phillip B. Thurston, J.
Grace Y. was born on February 23, 1971 to a mother addicted to 15 bags of heroin per day and a father whose whereabouts were unknown. She was found to be a neglected child on a petition brought by the Department of Social Services on February 26, 1971, which petition also alleged neglect of two older male children of the mother.
Grace was remanded on April 14, 1971 by order of the Family Court to the Catholic Guardians Society who placed the child with Mr. and Mrs. M. at the age of less than two months and she was placed with the Commissioner of Social Services by order of the Family Court dated December 5, 1971 for a period of up to 18 months.
By petition dated September 1,1972, the Department of Social Services asked that the child be removed from the custody of her foster parents Mr. and Mrs. M. and placed with her maternal grandmother residing in Puerto Rico. The petition for change of placement alleges that “ petitioner has investigated the maternal grandmother and * # * has found her to be a fit person with whom to place the children.” An affirmation submitted to the Commissioner of Social Services dated March 5, 1973 alleges that the motives behind returning the child to the natural grandmother were “ the benefit of association with an older brother and the love and affection of a close relative together with a strong probability of adoption by the said maternal grandmother.”
This court is charged with making a choice between the parties competing for the custody of this child and, therefore, a review of the present law of custody would be in order. There is, in this jurisdiction, quite literally a double standard in custody determinations. As between a natural parent and non-parent, the Court of Appeals has held that a natural parent has a superior right to the custody and care of a child “ unless compelling reason stemming from dire circumstances or gross misconduct forbid it in the paramount interest of the child, or there is abandonment or surrender by the parent.” (Matter of Spence-Chapin Adoption Serv. v. Polk, 29 N Y 2d 196, 199.)
The Spence-Chapin v. Polk decision is the most recent in a long line of Court of Appeals cases that reaffirm the ‘ ‘ fitness *79 of the parent ” test in custody disputes between parent and nonparent. See also: Scarpetta v. Spence-Chapin Adoption Serv. (28 N Y 2d 185); People ex rel. Kropp v. Shepsky (305 N. Y. 465); People ex rel. Claudia “ PP ” v. Sackey (40 A D 2d 130, revd. on other grounds 32 N Y 2d 742); Matter of Spencer (74 Misc 2d 557 [Family Ct., N. Y. County, 1973]); and People ex rel. Portnoy v. Strasser (303 N. Y. 539, 542), where the court held: “ No court can, for any but the gravest reasons, transfer a child from its natural parent to any other person, since the right of a parent, under natural law, to establish a home and bring up children is a fundamental one and beyond the reach of any court.” (Citations omitted.)
By contrast with the rule that favors natural parents in a dispute with nonparents, there is substantial agreement amongst the cases that where contestants for a child’s custody are on an equal footing; i.e., parent versus parent or nonparent versus nonparent, a weighing of the expert opinions of behavioral scientists provides the most nearly reliable standard on which to make a decision as to the child’s best interests. (See Pact v. Pact, 70 Misc 2d 100; Matter of Infant H., 69 Misc 2d 304, 308.)
The trend in many other jurisdictions has been, in recent years, to depart from the double standard in custody disputes that favors a “ fit ” natural parent in a contest with nonparents. In its place has evolved the concept that the “ best interests ” of the child should be solely dispositive of any custody dispute, and that such best interest can and should be determined largely from the potential psychological effects upon the child as analyzed and determined by expert witnesses. (See Matter of Guardianship of Marino, 30 Cal. App. 3d 952; Matter of B. G. and V. G., 108 Cal. Rptr. 121; Matter of Palmer, 81 Wn. 2d 604, 605, [“ We hold that the welfare of the child is the only operative standard * * * and all other considerations are secondary.”] ; and most particularly Painter v. Bannister, 258 Iowa 1390.)
The doctrine of parental primacy as expressed in SpenceChapin v. Polk and other New York Court of Appeals cases has been vigorously criticized in recent lower court decisions in our own jurisdiction. “ This court does not believe that these cases hold that absent a finding of unfitness of the mother, consideration of the child’s well-being is prohibited, and the child must be ordered returned forthwith to the mother.” (Rothman v. Jewish Child Care Assn., N. Y. L. J., Nov. 1, 1972, p. 17, col. 2. See, also, Matter of Mittenthal v. Dumpson, 37 Misc 2d 502; Matter of Catherine S., 74 Misc 2d 154.)
*80 It is the opinion of this court, however, that the rules enunciated in Spence-Chapin v. Polk (29 N Y 2d 196, supra) and Scarpetta v. Spence-Chapin (28 N Y 2d 185, supra) and other cases, are still the case law of this jurisdiction. It is possible that subdivision 5 of section 383 of the Social Services Law, effective May 30, 1972, changed the case law. But this issue has not yet been judicially determined and the Court of Appeals specifically refused to reach the question in Claudia “ PP ” v. Sackey (32 N Y 2d 742, supra).
Having established that the law gives primacy to a “ fit ” parent in a custody dispute, this court finds that it is not bound by the rule in the case at bar. The cases make it abundantly clear that the rule applies only to “ parents ” and not to other blood relatives. Nonparent relatives stand in the same position as any other contestant for the child’s custody and the sole criterion for determination is the ‘ ‘ best interests of the child. ’ ’ (See People ex rel. Teitler v. Haironson, 38 A D 2d 949, affd. 31 N Y 2d 712; Matter of Norman D. “ JJ.” v. Family and Childrens Servs. of Ithaca, 39 A D 2d 612; Matter of Perez, 69 Misc 2d 538, 545.)
Although not bound by the “ parental fitness ” rule in this case, the court cannot escape the conclusion that the rationale behind the rule that gives preference to a natural parent bespeaks a public policy that may have some relevance when the choice of custody is between nonrelatives and a fit blood relative. It has been well said that “ ‘ the status of a natural parent ’ is so important, ‘ that in determining the best interests of the child, it may counterbalance, even outweigh superior * * * advantages which may be afforded by adoptive parents * * * For experience teaches that a mother’s love is one factor which will endure, possibly endure after other claimed * * * advantages and emotional attachments may have proven transient.’ ” (Citations omitted.) (People ex rel. Anonymous v. New York Foundling Hosp., 17 A D 2d 122, 124, affd. 12 N Y 2d 863.)
If it is true that there is an intangible advantage in the care of a natural parent that makes it in the best interests of the child' to be with such parent, then is it not also true, to some extent, that there is an advantage in the bonds of blood that tie a child to a related nonparent custodian? If “ the right of a parent under natural law, to establish a home and bring up children is a fundamental one ” (People ex rel. Portnoy v. Strasser, 303 N. Y. 539, supra), is it not true, to some extent, that there is an analogous fundamental right in blood relatives of a child (without responsible natural parents) to bring up *81 the child in their customs, and traditions, to speak their language and to absorb their values ?
It is the public policy of this State that “ when practicable ” a child shall be placed in the custody of persons or an agency of the same religious persuasion as the child (N. Y. Const., art. VI, § 32). This provision has been strictly construed by the New York Court of Appeals in Matter of Starr v. De Rocco (24 N Y 2d 1011). In that decision the Appellate Division found that this provision was intended to prohibit the placement of a child with a guardian of a religious persuasion other than that of the child unless some compelling reason required otherwise. The court found that there were available able and willing persons, blood relatives of the children, who professed the same religious faith as them and against whom no reason for rejection existed.
Would it not be proper, in view of this policy, to hold that a child ought to be placed with a family of his own cultural, ethnic and linguistic persuasion when there is a blood relative available, who is fit and against whom no objection exists?
This is a point of view implicit in the Department of Social Services ’ petition for change of placement. This court has considered that view very carefully and is constrained to reject it. The court is sympathetic to the arguments in support of the natural right of blood relatives to bring up their own, and the right of a child to the rich cultural heritage of his biological forebears. But these factors are clearly outweighed in the face of expert psychiatric testimony indicating that a change of placement for this child would be a serious emotional trauma.
The court notes the following psychiatric opinion submitted in evidence by the foster parentsTo separate a child * * * from the only family he has known and to place him in another culture, .with another language, and with strangers — even though they may be related to him — is undoubtedly a serious trauma and will cause a setback in normal development * * * [He] will undoubtedly be depressioned with serious regression. The child’s ultimate ability to trust will be compromised * * * My own feeling is that to move a child from what was apparently a good home for three years, and where he is making progress, and to place him with strangers is to run a considerable risk as to future development.”
This court is unwilling to take that risk in the face of this and other supporting expert opinions. It therefore is determined that the best interests of the child are the sole standard by which this case is to be decided. As such it is further deter *82 mined that it is in the best interests of this, child that she remain with her present foster parents, who had expressed a wish to adopt the child for over two years, and the petition of the Department of Social Services for change of placement is denied.