John S. Marsh, J.
The petitioner, a married woman separated from her husband since 1949, is the mother of a male child born August 8, 1958, and in this proceeding- seeks custody of the child who has been with respondents since he was 11 days old.
It appears that petitioner, following her separation from her husband, went to reside in the home of her parents. Her pregnancy in 1957 created a difficult family situation and several months- before her delivery, she was forced to leave her employment and home and take up residence with a middle-aged couple who were old family friends.
*390 Her emotional turmoil was such that she sought to completely conceal her condition and did not even seek medical assistance until a few days prior to the birth of the child. It does not appear that prior to consulting a doctor, she did any planning with reference to the future care of the child. The doctor she consulted referred her to another doctor whom she saw on August 7, 1958. In conference with the latter doctor, adoption was discussed and petitioner, was referred to Mr. Charlton G. Blair, respondents’ attorney. Petitioner went to the attorney’s office the same day, the doctor having found evidence that labor was imminent, and an extended conference was held between petitioner and Mr. Blair, at which time her lack of financial means was explained, the implications of a voluntary adoption were explored and information obtained as to the background of the petitioner and the alleged putative father. As a result of the discussion had, in the course of which Mr. Blair explained that he was acting as attorney for proposed foster parents and was, therefore, not acting in petitioner’s behalf, petitioner indicated her desire to place the child for adoption, with the understanding that he be raised in her own religious faith. The same day she went to a hospital suggested by Mr. Blair under an arrangement with him that his clients would defray all hospital and medical expenses. The following morning the baby was delivered.
It would appear that emotional reactions and consideration of personal problems caused petitioner, from time to time in the hospital, to be assailed by serious doubts as to what course she should pursue. On August 14, 1958 her attitude was such as to cause Mr. Blair to threaten disassociation from the case but after a further call from her, a release, surrender and consent to adoption of the child by the respondents were prepared and later signed by petitioner in her hospital room on August 15, 1958. Present at the time of signing with petitioner were Mr. Blair and his secretary.
Petitioner claims she called Mr. Blair the same night and asked to have the papers destroyed. Mr. Blair denies such a call but does state that when he called her on August 18, 1958 to tell her she could leave the hospital, she then asked to have the consent and surrender instruments destroyed.
The respondents, a young couple of excellent reputation and standing in the community, took the child from the hospital on August 18, 1958, and since that time have apparently given him excellent care and have developed a love and affection for him. After recovering her strength and several weeks after leaving *391 the hospital, petitioner contacted an attorney and following correspondence between her attorney and respondents’ attorney, Mr. Blair, a conference was held between the parties on November 4, 1958. Petitioner’s demand for the return of her baby was refused and this proceeding was thereupon instituted. The court is called upon in connection with the issues presented, to make a determination which will undoubtedly have a profound effect on the future lives of the infant, his mother and the respondents. In making that determination the court is bound to have regard for the primacy of parental rights which the law has always recognized.
As was stated by our Court of Appeals in People ex rel. Kropp v. Shepsky (305 N. Y. 465) “ In no case may a contest between parent and nonparent resolve itself into ‘ a simple factual issue as to which [affords] the better surroundings, or as to which party is better equipped to raise the child ’” (p. 469). “ ‘ No court can, for any but the gravest reasons, transfer a child from its natural parent to any other person * * * since the right of a parent * * * to establish a home and bring up children is a fundamental one and beyond the reach of any court ’ * * * The mother or father has a right to the care and custody of a child, superior to that of all others, unless he or she has abandoned that right or is proved unfit to assume the duties and privileges of parenthood.” (p. 468).
In the light of these established principles, for this court to sever the natural relationship of mother and child by depriving the mother of her right to the child’s custody would require a finding either that she had forfeited her rights by abandoning the child or that she is unfit to have his care and custody.
Clearly, no adequate showing of the latter has been made and while, from the evidence, it would appear that petitioner’s resources are in no sense comparable to the respondents’, she has presented a plan for the care of her child in her own custody which would appear to be entirely adequate and which reflects a real concern for the welfare of the infant.
As to whether there has been an abandonment here, the court finds the evidence falls far short of establishing circumstances from which it might find a settled purpose on the part of the mother to forego all parental rights and duties and to relinquish all parental claims.
The execution of a consent and a surrender by the mother, as revealed here, without the benefit of professional advice and counsel when she was overwhelmed by personal problems and emotional forces that would obviously affect her ability to form *392 a sound, reasoned and deliberate judgment, did not, in the view of this court, establish any settled purpose on her part to do anything and certainly not to abandon her child. A clear demonstration of the absence of any settled purpose is found in the evidence of her uncertainty immediately preceding the signing of the documents and her renunciation of them shortly afterward.
The loss of the child to the respondents who now have had him for almost six months will no doubt be deeply felt. The risk was theirs, however, when they retained the child after notice of the mother’s claims, and was theirs in any event' by reason of the absence of a surrender of the child by the mother to an authorized social agency which, under our adoption law, provides an effective means of terminating the mother’s rights.
In the light of the foregoing, an order may be entered herein sustaining the writ of habeas corpus and awarding custody of the child to the petitioner.