Cesar H. Quinones, J.
This is a custody proceeding involving the natural mother and a couple who have acted as very good foster parents of a boy who is now over 14 years old.
The facts are as follows:
The petitioner, Confessora B., left her son, Robert P. in the care of the respondents, Ana and Manuel L. She claims that the child was three years old at the time, although the respondents contend that the child was only 18 months old when he was given to them. Mr. L. is a first cousin of the child’s father and the petitioner testified that she had asked the respondents to care for her child because at the time she was ill and in need of hospitalization as the result of a severe beating administered by the child’s father, and she had no one else to care for Robert. Petitioner stated that for the next two years following her leaving the child with respondents she was intermittently hospitalized at various hospitals, and that following that period due to economic difficulties she was unable to obtain her own apartment and lived in furnished rooms. In the meantime the child continued to live with the respondents, and the natural mother visited him frequently.
In 1967, when the child was eight years old the petitioner finally obtained her own apartment and requested that her son be returned to her. The foster parents refused to return the child and in July, 1967, the natural mother initiated habeas corpus proceedings and at that time, without a hearing, the foster parents returned Robert to the natural mother.
After the child returned to live with petitioner he continued to visit the respondents frequently until petitioner, in May, 1968, moved to California with her children. While in California, Robert maintained contact with the respondents by letter and telephone.
In the summer of 1969, the natural mother returned to New York City together with the child. Robert’s plane fare was paid for by the respondents. The petitioner testified that on the weekend prior to her scheduled flight back to California the foster parents begged her to let Robert spend the weekend with them so that he could attend a children’s party, and that in actuality, this was just a trick to regain custody of the boy and that when she went on Sunday to get the child he was not at the respondents ’ home and that she was told by a relative of the respondents that the child had gone to Pennsylvania with the respondents; that later, on the promise by respondents that they would send the child to California whenever she requested, she returned to California and left Robert with the foster parents. *578 The petitioner testified further that in January, 1970, she asked the respondents to return the child to her, and that not only did they not return him but they did not allow the boy to talk to her on the telephone when she called, and did not give the child letters that she wrote to him. The foster parents deny this, stating that Robert was living with them prior to the start of school in September, 1969. They state that the natural mother gave the child back to them permanently. As proof of this fact they submitted a notice from their neighborhood public school acknowledging Robert’s enrollment prior to the start of the school year. Robert has been living with the respondents since then.
In June, 1971 the petitioner initiated a habeas corpus proceeding to compel the respondents to return the child to her and the respondents responded with an order to show cause why they should not be allowed to retain custody of the child. Both matters were joined in Supreme Court, Kings County and referred to our court for a hearing, investigation and determination.
There is no allegation that the natural mother or the foster parents are unfit and our court mental health clinic which examined the parties and the child Robert with the parties’ consent, has found both the natural mother and the foster parents capable of adequately caring for Robert. It is further conceded by the petitioner that the respondents have always provided Robert with very adequate and loving care.
The respondents contend that both at the beginning and later on in 1969, the petitioner had turned the child over to them permanently, which allegation the natural mother denies, but there is nothing in the testimony that could be construed as abandonment of the child on the part of the natural mother.
The petitioner contends that in the absence of unfitness or abandonment on the part of the natural mother she has superior right over any other person and that the court has no alternative but to return the child to the natural mother. (Meyer v. Nebraska, 262 U. S. 390, 399; People ex rel. Anonymous v. Anonymous, 10 N Y 2d 332; Matter of Jewish Child Care Assn. of N. Y. [Sanders], 5 N Y 2d 222; People ex rel. Kropp v. Shepsky, 305 N. Y. 465; Matter of Connors v. Arnold, 36 A D 2d 1010; Matter of Hill [McCarley], 3 A D 2d 424; Matter of Giegerich, 198 N. Y. S. 2d 585; People ex rel. Anonymous v. Anonymous, 19 Misc 2d 441; Matter of Anonymous v. Anonymous, 15 Misc 2d 389; People ex rel. Gill v. Lapidus, 202 Misc. 1116; People ex rel. Loomis v. Des Jarden, 113 N. Y. S. 2d *579 96; People ex rel. Pascale v. Lanza, 166 Misc. 370; People ex rel. Portnoy v. Strasser, 303 N. Y. 539; Spence-Chapin Adoption Serv. v. Polk, 29 N Y 2d 196.)
The respondents contend that while the rights of the natural mother are of the highest significance in any custody dispute, the paramount issue and deciding factor is always the best interest of the child. (Matter of Catherine S., 74 Misc 2d 154; People ex rel. Coage v. Colbert, 75 N. Y. S. 2d 865.)
The court is indeed fortunate and deeply indebted to its learned colleague, Judge Jacob T. Ztjkebmatt, for this is the very same issue to which he addresses himself in Matter of Catherine S. (supra). His review of the numerous cases relating to this issue both in New York State and throughout the country, of articles dealing with child’s rights and interests and the role of the court acting for the State as parens patriae and the works of notable psychoanalysts on what they consider the essential elements for a child’s successful development and all other facets are thoroughly examined in his scholarly decision. This court unreservedly concurs in his opinion that the best interests of the child must in the final analysis be the deciding factor.
The ‘ ‘ best interest ’ ’ rule must govern in determination of custody between parents. Certainly the child is not entitled to less when the issue is between a parent and a foster parent.
There is a strong presumption that, barring unfitness or abandonment, the natural parent has rights superior to anyone else with the one exception, of course, being the rights of the child itself.
A review of the facts must indicate powerful and compelling reasons to overcome said presumption and grant custody to other than the natural parent.
There are at least two such factors in this matter that vitally affect the child’s emotional and psychological well-being, both interrelated and compelling enough to dictate continuance of Robert with the foster parents.
The first vital consideration is the length of time that the child has been with the foster parents and the second is the age of the child and his expressed desire to remain with the respondents. Let us consider each of these in detail.
The youngster has lived with the foster parents continuously since at least the age of three, except for the two years during 1967-1969 when he lived with his natural mother. Certainly he has been with the foster parents since his earliest recollection. The natural mother claims that poor economic conditions pre *580 vented her from reclaiming her child prior to his eighth birthday. During this time she was living in New York City, where at least public assistance would have been available to the petitioner had she really been desirous of having the child with her. The court feels that part of the reason for the lengthy initial stay of the child with the foster parents was the lack of real urgency in the situation. This is not said in accusation of the natural mother, but as a realistic view of the facts.
The child was being very well cared for by the respondents, was happy with them, and, materially at least, better off with them. On the other hand the natural mother was able to visit the child frequently, and did so, which is indicative that a good relationship existed between the parties during this time. It might be said that these factors removed the need for immediate action on the part of petitioner, once she had recovered physically to reclaim her son.
And yet, these were the formative preschool and early school years for the child, years during which the emotional bond between child and foster parents was being nourished and strengthened. Again, in 1969, after having the child with her for two years, the natural mother allowed him to remain with the respondents while she went back to California. Petitioner claims that this was caused by trickery and deceit on the part of the respondents, but having had the experience of having to resort to court action to get Robert back the first time one can only wonder as to what motivated the natural mother to trust the respondents a second time when one remembers that Robert kept in touch with the foster parents while he was in California, and that the parties hereto were also in pretty regular communication. A more credible conclusion is that once again there was a lack of real urgency on the part of the petitioner and that she acquiesced to the pleas of both the child and the foster parents that Robert be left with them for a time at least in New York City. Once again the natural mother could not see the harm in the continued separation from her son, and in his return to the respondents and therein lies the heart of the problem.
A child is not a piece of furniture which can be put in storage for an indefinite period of time and reclaimed at the owner’s convenience. A child is affected by, and reacts physically, morally and psychologically to his environment and the persons who surround him. These are the factors that mold him, teach him and in general, affect the total being of the child.
This is best expressed by the following quote from a Yale Law Journal article (73 Yale L. J. 134, 158) as contained in Catherine *581 S. (74 Misc 2d 154, 158, supra): “ The extensive works of notable psychoanalysts such as Erikson, Bowlby and Anna Freud have established that ‘ the mutual interaction between adult and child, which might be described in such terms as love, affection, basic trust, and confidence, is considered essential for the child’s successful development, and it is the basis of what may be termed psychological parenthood. It is this psychological parenthood, rather than the biological events which may precipitate such a relationship, which many psychologists identify as the sine qua non of successful personality development * * * After a period of separation from the biological parent and care by a third party, the child may learn to look upon the latter as his psychological parent * * * When this has happened, a change in custody based solely on biological relationship might, by disrupting the existing relationship of psychological parenthood, work considerable emotional harm upon the child’”.
That very aptly describes our situation. This child has lived with the foster parents for so long that he considers them to be his real parents and loves them as such. He knows his natural mother, lived with her for two years, and yet his bonds with the foster parents are so strong that although he is reluctant to hurt his mother, he is nonetheless very intense in his desire to remain with the respondents. In view of all the facts this is a normal and predictable reaction on Robert’s part.
It is lamentable that two years have elapsed from the commencement of this present action to the present time, because in matters of this nature the mere passage of time by itself can cause irreparable damage to any or all of the parties involved. A quicker method to resolve the issues must be devised in order to render substantial justice to all concerned. And yet, the court cannot ignore the effect the past four years of living with the respondents has had on the child’s expressed preference for them.
The second vital factor, which can be said to almost be a direct result of the first, is the age of Robert and his desire to remain with the foster parents.
The court mental health clinic examined Robert. The clinic report recommends to the court that Robert’s desire to remain with the foster parents be granted in the best interests of the youngster.
The court interviewed Robert in chambers in the presence of counsel. He impresses as mature and well-adjusted, a young person very anxious to let the court know how very much he *582 desires to remain with the foster parents, the persons he has. known and loved all his life.
Robert is 14% years old and sufficiently intellectually and morally developed that the court must give considerable weight to his expressed desire in a decision that so totally affects his future. (Kesseler v. Kesseler, 10 N Y 2d 445; Gallaher v. Bencene, 27 A D 2d 690.) Of course, the court is not bound by the child’s wishes and can make a contrary determination in the best interest of the child. In this case, fortunately, there is no such need.
Custody decisions are always very difficult, involving as they almost always do, one of the deepest feelings persons can experience, the love of parent for child, and conversely, child for parent. What eases the burden a little is the conviction that one is acting in the best interests of the child, the most innocent and helpless participant of all, and the hope that the adults will accept it in this light and react wisely and maturely to the future benefit of the youngster.
Therefore, the petitioner natural mother’s application for custody is denied. The respondents ’ cross motion is granted and Robert is to remain with Mr. and Mrs. L. Petitioner’s writ is dismissed.