In the Matter of the **ADOPTION OF K. S.,**
a minor child.

No. 2359.

Supreme Court of Alaska.

Dec. 22, 1975.

Gregory D. Hoffman, Legal Intern, and John Silko of Alaska Legal Services Corp., Ketchikan, for appellant (natural mother).

W. Clark Stump, of Stump & Stump, Ketchikan, for appellees.

OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, ERWIN and BURKE, JJ.

ERWIN, Justice.

This case involves an appeal from a superior court decision which granted Richard and Celeste's petition for adoption of K. S. The appellant is the natural mother of K. S.

On June 16, 1969, Carol gave birth to K. S. out of wedlock in Portland, Oregon. For the next eleven months Carol and K. S. lived in Portland with the child's maternal grandmother, Betty.

In the summer of 1970, Carol and K. S. moved to a residence in northwest Portland and began living with John, Carol's boyfriend. An unemployed heroin addict, John supported his habit by selling drugs to other users. Among those purchasing narcotics from John were Richard and his wife, Celeste, appellees in this matter. Through this relationship Carol became acquainted with Richard and Celeste in January, 1971.

In the summer of 1971 Carol began to suspect that K. S. might have a hearing problem. In June she took K. S. to the Portland Center for Hearing and Speech, where it was determined that a serious hearing deficiency did in fact exist. In addition, Carol took K. S. to a private physician, who diagnosed the deafness as the result of a birth defect.

Richard and Celeste continued to purchase heroin from John throughout 1971, and in January of 1972 they moved into a

house in Portland with John, Carol and K. S. It was during this time that Carol began using heroin. A few months later Richard and Celeste moved to Astoria, Oregon, but continued to see Carol and John in order to transact drug business.

In late May or early June of 1972, Carol allowed Richard and Celeste, who were again living in Portland, to take temporary custody of K. S. while she and John moved. The length of time that K. S. stayed with Richard and Celeste is in dispute, but it was somewhere between three weeks and two months. During this separation Carol visited Richard and Celeste's home almost every day to buy drugs and see K. S.

In September of 1972 Carol, John and K. S. moved to Tucson, Arizona. Approximately one month later John was arrested for armed robbery, and Carol was arrested as an accessory.[1] While Carol was incarcerated K. S. was placed in foster care and enrolled in the Easter Seal School for the Deaf in Tucson. Upon her release from jail, Carol entered a hospital for three weeks' detoxification. One month after her release from the hospital, approximately eight weeks after the initial arrest, Carol regained custody of K. S. K. S. continued attending the Easter Seal school until May, 1973; and as a result of the training provided, Carol and K. S. learned to use some sign language.

In May of 1973 John (who had since been placed on probation for the robbery), Carol and K. S. moved back to Portland; and in the latter part of July, Richard and Celeste, who were then living in Myrtle Creek, Oregon, met them there. During this visit Carol gave Richard and Celeste custody of K. S., although there is a dispute surrounding the terms under which they were to take care of the child. It was Carol's contention that they agreed to care for K. S. while she went through a heroin withdrawal program in a local hospital, which she did enter on July 26, 1973. Richard and Celeste, on the other hand, denied any knowledge of Carol's plans for hospitalization and claimed that they offered to care for K. S. while John and Carol, who had been evicted from their apartment, found another place to live.

Upon returning to Myrtle Creek, after having had custody of K. S. for about five days, Richard and Celeste decided to visit Thorne Bay, Alaska. Apparently because they were unable to contact Carol or find out where she was Richard and Celeste called the child's maternal grandmother, seeking permission to take K. S. for a two-week vacation in Alaska. At this time the maternal grandmother had no knowledge of Carol's heroin addiction, hospitalization, or whereabouts, and because she was unable to take care of the child herself at that time, she consented to the trip. The maternal grandmother, who was in the process of moving, informed Richard and Celeste that they could obtain her new telephone number through the area operator upon returning from the vacation.

Richard, Celeste and K. S. departed for Alaska during the last days of July, 1973. Less than a week later Carol was released from the hospital and discovered that K. S. had gone to Alaska. Although Carol was upset about K. S.'s absence, no steps were taken to find her because the maternal grandmother assured Carol that K. S. would be returned in due time, as initially planned. After waiting for several weeks, Carol grew impatient; and on August 29, 1973, she called the Portland Police and the juvenile authorities concerning K. S.'s whereabouts.

1. Carol, who was using heroin at the time of her arrest, testified at the adoption hearing that her lawyer told her to enter a hospital to help her "beat the case." She further testified that she entered the hospital and the charges were dismissed. Although the record is somewhat unclear regarding the facts of the case, Carol testified that her involvement was limited to sitting in the front seat of a car while John and another man robbed a third person in the back seat.

Also, according to Carol's testimony, she attempted to locate Richard and Celeste through Richard's father in Oregon, although the circumstances surrounding this matter are in dispute. Carol and the maternal grandmother testified that Richard's father refused to disclose his son's location when they initially telephoned him. Only later, they contend, could they obtain the Alaska address, and then only by deceiving him into believing Richard had become a beneficiary in a will. On the other hand, although Richard and Celeste admit that they made no attempt to inform Carol or the maternal grandmother as to their location or plans, they claim that they did converse with Richard's father in Oregon (because Carol had located them on a prior occasion by calling him), to determine whether he had received any inquiries regarding K. S. They testified that Richard's father informed them that he had not received any calls concerning K. S. Richard and Celeste interpreted this to mean that Carol was not looking for K. S. Thus they saw no need to inform Carol or the maternal grandmother as to their whereabouts or the fact that they planned to stay in Alaska, without returning K. S., longer than two weeks.

When the Alaska address was ultimately obtained in October of 1973, it was given to the juvenile authorities in Portland, who thereupon contacted Richard and Celeste through the Alaska Division of Family and Children's Services. Richard, Celeste and Carol talked a number of times by phone, and it was eventually agreed, because both parties were in poor financial condition, that K. S. would be returned in January when Celeste went south for surgery, unless Carol could come to get the child sooner.

Although Carol was given the impression in October that K. S. would be returned in January, during the latter part of 1973 Richard and Celeste began contemplating retaining custody of K. S.

Eventually Carol and the maternal grandmother saved enough money to fly the maternal grandmother to Ketchikan, and Richard and Celeste were notified that she would arrive at the end of January to get K. S. Though Richard and Celeste led them to believe that this would be the final arrangement, it was during the last days in January that they secured a restraining order to prevent Carol from obtaining custody of K. S. and filed a petition for adoption. When the maternal grandmother arrived in Ketchikan, she was presented with the restraining order and the child was not released to her custody.

When the maternal grandmother returned to Portland, she and Carol secured the services of a private attorney in Ketchikan, who in turn stipulated to Richard and Celeste's continued custody of K. S. pending a hearing on the petition for adoption. Alaska Legal Services became Carol's attorney of record in July, 1974, and represented her at the adoption hearing held on September 30 and October 1, 1974.

Reports from social agencies in Oregon and Alaska, detailing the past behavior of Richard, Celeste and Carol, were filed with the court. A social worker with the Division of Family and Children's Services in Ketchikan provided a detailed report of her personal contact with Richard, Celeste and Carol, as well as a background sketch on each of the parties. In addition, a social worker with the Children's Services division in Portland filed a report; and a Portland counselor who had worked with Carol submitted a report and testified at the hearing.

At the time of the hearing Carol was living in Portland, where she was working as an undercover narcotics agent with the Portland police. Richard, Celeste and K. S. were living in Anchorage, where Richard was employed as a mechanic, and K. S. was attending a special education school. All parties had stopped using drugs.

At the hearing on the petition for adoption, Carol refused to consent to the adoption of K. S. Richard and Celeste argued that Carol had abandoned K. S. and, in addition, was unfit for the care and custody

of K. S., and thus her consent was not necessary. The trial court dismissed the abandonment allegation but found that Carol was unfit. On October 21, 1974, the court entered a decree of adoption for Richard and Celeste.

AS 20.10.020(3) states that the consent for adoption of a minor is required before a hearing on the petition

> if the person to be adopted is a minor of illegitimate birth, not subsequently legitimatized, then by his mother if living, except as otherwise provided. . . .

K. S.'s mother was unwilling to give the consent required by AS 20.10.020(3); thus the trial court was without jurisdiction to grant the petition for adoption unless one of the exceptions to consent enumerated in AS 20.10.040 were applicable.[2] Indeed, the trial court did find that subsection (6) was pertinent.[3] AS 20.10.040(6) provides in part that the consent for adoption of a minor is not required

> from a parent adjudged by the court to be *unfit to have the care and custody of the child.* (Emphasis added)

■ It is well established that there is a legal presumption that the natural parent is fit [4] and that the burden of proof is upon the petitioner to show that the parent is unfit. However, this court has never determined the appropriate standard of proof relative to parental unfitness under AS 20.10.040(6).

■ The trial court utilized a standard of proof calling for "clear and convincing" evidence of the natural mother's unfitness for the care and custody of K. S. Support for this standard may be found in AS 47.-10.080(c)(3)(D), which provides in part:

> (c) If the court finds that the minor is dependent, it shall
>
> . . . . . .
>
> ■ by order, terminate parental rights and responsibilities . . . if one of the following conditions exists:
>
> . . . . . .
>
> (D) each parent . . . has demonstrated by his conduct, proven by *clear and convincing proof amounting to more than a preponderance of the evidence*

---

2. AS 20.10.040 reads as follows:
 Consent for adoption of a minor is not required
 (1) from a parent who was more than one year prior to the filing of a petition for adoption adjudged to be insane, and not thereafter legally declared sane;
 (2) from a parent who is imprisoned in the penitentiary at the time of the filing of the petition under sentence for a term of three years or more;
 (3) from a parent whose wilful abandonment of the child has been established in a judicial proceeding;
 (4) from a parent whose wilful abandonment for a period of not less than 30 days preceding the filing of the petition is established in the adoption proceeding; but the parent shall be personally served with a copy of the petition and notice of hearing inside or outside the state not less than 20 days before the date of the hearing;
 (5) from a divorced parent who was not awarded full or parttime custody of the child; but the parent shall be personally served with a copy of the petition and notice of hearing inside or outside the state

not less than 20 days before the date of the hearing;
 (6) from a parent adjudged by the court to be unfit to have the care and custody of the child, but a copy of the petition and notice of hearing shall be served upon the parent by personal service inside or outside the state at least 20 days before the hearing;
 (7) from the natural father if the person to be adopted is a minor of illegitimate birth, not subsequently legitimatized, and notice need not be given him.

3. The present case was filed in the superior court on the 25th day of January, 1974. Thereafter the state legislature enacted a new adoption statute which became effective August 8, 1974. As 20.15.050, which does not utilize parental unfitness as a means of obviating consent, was not made retroactive under AS 01.10.090.

4. Simpson, *The Unfit Parent*, U.Det.L.J. 347, 355 (1962). *Reynardus v. Garcia*, 437 S.W.2d 740 (Ky.1968); *B. v. L.*, 75 Misc.2d 576, 348 N.Y.S.2d 21 (1973); *In Re Spencer*, 74 Misc.2d 557, 346 N.Y.S.2d 645 (1973).

*that he is unfit* to continue to exercise his parental rights and responsibilities. (Emphasis added)

There appears to be no rational basis for the application of a lesser standard of proof in adoption cases since a finding of unfitness would incur the same result: a termination of parental rights. Hence, it would appear that the standard of proof enunciated by the trial court, one requiring clear and convincing evidence of the natural mother's unfitness, was proper.

 Despite the court's correct statement of the standard of proof to be applied, we have difficulty with determining whether the court decided the issue of unfitness in the proper manner. Throughout the opinion, it appears that the court is comparing the advantages to the child of residing with the petitioners for adoption as compared with residence with the natural mother. The opinion may be construed as approaching the question as one of determining whether Richard and Celeste would constitute better parents than would Carol, or stated in another manner, what would be in the best interests of the child K. S.? Such consideration would, of course, enter into the final decision with reference to adoption. Those concerns, however, should be considered only after an independent decision as to Carol's unfitness.

Thus, we remand this case for additional findings of fact by the trial court on the issue of unfitness. We further note that a recent decision of this court, *Turner v. Pannick*,[5] discusses the analogous issue of child custody as between natural parents and third parties.[6] The trial court should consider this opinion in reaching its conclusions of law and ultimate decision in this case.[7]

5. Opinion No. 1189 (Alaska 1975), 540 P.2d 1051.

6. The citation to the recent case of *Turner*, *Id.*, is intended to permit the trial court to have the benefit of the latest case in this area and is not intended to indicate how the case is applicable herein.

7. Nothing herein is intended to preclude the trial court from taking additional testimony, particularly since some time has elapsed since the original hearing.