557 P.2d 1128 (1976)
In the Matter of E.J. (T.), a minor.
No. 2775.
Supreme Court of Alaska.
December 17, 1976.
Brian C. Shortell, Public Defender, Anchorage and Walter L. Carpeneti, Asst. Public Defender, Juneau, for appellant.
Avrum M. Gross, Atty. Gen., and Richard M. Burnham, Asst. Atty. Gen., Juneau, for appellee.
Before BOOCHEVER, Chief Justice, and RABINOWITZ, CONNOR, ERWIN and BURKE, Justices.

*1129 OPINION
ERWIN, Justice.
This is an appeal from a lower court order terminating appellant E.D.T.'s parental rights in his natural son, E.J.(T.).
On January 30, 1970, Ms. E.J., who had been cohabiting with Mr. E.D.T. knowing that they were not married, gave birth to a male child in Juneau, Alaska. The child will hereafter be referred to as E.J.(T.).
In early 1971, when the child was a year old, the parents separated. The natural mother, with the father's permission, took custody of E.J.(T.). The separation was not permanent, however, for on at least one occasion the parents reunited. After a quarrel with Mr. T., Ms. J. departed from Juneau in 1972 and left E.J.(T.) in his father's custody. Finding himself unable to care for the child on his own, in September, 1972, Mr. T. sought assistance from the Division of Family and Children Services of the Department of Health and Social Services.
Approximately two weeks later, on September 18, 1972, Mr. T. legitimized his son. On the following day he left Juneau to receive job training at the Skill Center in Seward, Alaska. In October the natural mother voluntarily gave custody of E.J. (T.) to the State, and the child was placed in a foster home.
Mr. T. returned to Juneau in late December, 1972, and took custody of E.J.(T.) for two days. He then departed for Seward and did not return to the Juneau area until he completed his training in March of 1973. During the six months Mr. T. was in Seward, his separation from Ms. J. became permanent. In March, 1973, Ms. J. married a Juneau resident and regained custody of her child.
On May 21, 1974, the State filed a petition seeking custody of E.J.(T.). Following a hearing, an order was issued establishing the child as a dependent minor. The State was granted custody for one year, and on July 15, 1974, the child was placed in the Alaska Youth Village where he presently resides. One year later, in July, 1975, the natural mother executed a relinquishment of parental rights.
Pursuant to AS 47.20.080(c)(3)(B),[1] a petition alleging that Mr. T. had abandoned his natural son, E.J.(T.), was filed in the superior court in Juneau, Alaska, on September 17, 1975. A hearing was held on November 26, 1975, at which the State, Mr. T. and E.J.(T.) were represented by counsel. Witnesses were called by the State and by Mr. T. At the conclusion of the hearing, the trial judge found that the evidence clearly and convincingly established that Mr. T. had abandoned his natural son, E.J.(T.), for a period longer than six months. Termination of parental rights was requested by both the State and the guardian ad litem; an order terminating Mr. T.'s parental rights in E.J.(T.) was entered on December 10, 1975. This appeal followed.
The first issue before this court is whether the trial court erred in finding that the natural father had abandoned his child. The trial court, applying a standard of "clear and convincing proof,"[2] found *1130 that the natural father had abandoned E.J. (T.). In reviewing this finding, we must view the evidence and the inferences therefrom in the light most favorable to the State.[3] The trial judge's finding will be overturned on review only if this court determines that it was clearly erroneous. In a recent opinion we defined the clearly erroneous standard as
... one which leaves the supreme court with a definite and firm conviction on the entire record that a mistake has been made, although there may be evidence to support the finding.[4]
Abandonment, as applied by the trial court and frequently defined by this court, is:
... conduct on the part of the parent which implies a conscious disregard of the obligations owed by a parent to the child, leading to the destruction of the parent-child relationship.[5]
In addition, AS 47.10.080(c)(3)(B) provides that the child must have been abandoned for at least six months before termination of parental rights can be ordered.[6] The trial court found this requirement fulfilled.
Appellant contends that he did not consciously disregard his obligations to his son, maintaining that on numerous occasions he offered and attempted both to support and to visit his son, but he was rebuffed in those attempts by the child's mother (except on one occasion) and that he acquiesced in her desire that he remain away from her family after being assured that neither his help nor his presence was desired. He submits that, taking into account his "verbal expressions ... as well as his actual conduct"[7] and his "somewhat passive and reticent nature,"[8] this court should be left with the firm conviction that the trial court erred in finding abandonment.
At the hearing conducted on November 26, 1975, Mr. T. testified that he wished to regain custody of his son and was attempting to establish a home where he would be able to raise E.J.(T.). Such testimony could have been considered by the trial court in determining whether Mr. T. had a subjective intent not to abandon his son. In the past, however, this court has observed that the
subjective intent standard often focuses too much attention on the parent's wishful thoughts and hopes for the child and too little on the more important element of how well the parents have discharged their parental responsibility.[9]
Recently this Court observed that prior Alaska cases
demonstrate that in deciding the question of abandonment the trial court must initially predicate its determination upon objective evidence of parental conduct *1131 indicating a conscious disregard of the parental role. Clearly, under the mandate of In re D.M. [515 P.2d 1234 (Alaska 1973)], a conclusion of nonabandonment based solely upon evidence of the parent's subjective intent not to abandon his responsibilities would be reversible error.[10]
Thus, in determining whether Mr. T. abandoned his son, we must view objectively not only his verbal expressions but his conduct as a parent as well.[11] With the foregoing in mind we proceed in our review of the case at bar.
The record reflects that Mr. T.'s last contact with his son prior to the November, 1975, hearing was during Christmas of 1972, when the child was in the custody of the State. For at least three years subsequent to this time, the father did not visit, telephone, or contact his son. Moreover, he was unaware at the time of the hearing in 1975 whether the mother had ever gotten the child back from the State's custody since his 1972 visit. This lack of contact is particularly noteworthy because Mr. T. had been living in the same town (with a population of less than 20,000 people) as his son and the natural mother since March, 1973.
Further, in the two and one-half years between his return to Juneau and the hearing, Mr. T. not only failed to contact his son, but he also failed to contact either the Division of Social Services or Ms. J. to inquire about his son. When he did see Ms. J., it was the result of chance encounters on the street or in various bars.
Mr. T. testified at the hearing that except for one $50 payment to Ms. J., he did not make any support payments because Ms. J. informed him that her husband was taking care of everything. However, Mr. T. knew that E.J.(T.) had been in the custody of the State in 1972, and he did not thereafter receive any information that indicated that the child was back with his mother. Thus, the record does not support Mr. T.'s contention that the primary reason he did not contact or provide support for E.J.(T.) was because neither his help nor presence were desired by the child's natural mother.
Appellant cites the case of In re Adoption of V.M.C.,[12] in which this court affirmed the trial court's finding of no abandonment. He submits that the facts of the two cases are similar. However, we do not find that case controlling. While the father in V.M.C. was separated from his child for approximately four years, he had continuously engaged in conduct which, when viewed objectively, indicated a desire to exercise his parental obligations.[13] Such an objective indication is not present in the case at bar.
*1132 Mr. T.'s failure to communicate with or visit E.J.(T.),[14] and his failure to support his son in any manner, either emotionally or financially, while the child was separated from his mother and committed to a foster home on a long term basis,[15] represent a clear demonstration of "conduct on the part of the parent which implies a conscious disregard of the obligations owed by a parent to the child... ."[16] That Mr. T.'s behavior has resulted in the "destruction of the parent-child relationship"[17] is evidenced by the testimony of the child's houseparent at the Alaskan Youth Village and of his social worker that E.J.(T.) had never mentioned his natural father in the fifteen months that they had spent with him prior to the termination proceedings. Based on the entire record, it cannot be said that the trial court was clearly erroneous in finding that the facts established by clear and convincing evidence that Mr. T. had abandoned his son.
The next issue before the court is whether the trial court abused its discretion in failing to consider the possibility of setting up a plan for re-establishing a family relationship between the father and his son.
The record reflects that during the course of the termination hearing, appellant suggested the possibility of a program under which he could eventually regain custody of his child. The trial court denied his request for consideration of such a plan. Relying on two recent Alaska cases, In re B.J.[18] and In re S.D., Jr., M.D., A.D., and I.D.,[19] appellant submits that the trial court's failure in the instant case to consider a procedure to re-establish the parent-child relationship should properly be considered an abuse of discretion.
In the past this court has strongly approved programs which would benefit the parent-child relationship. In In re S.D., Jr., M.D., A.D., and I.D.,[20] this court endorsed the work of the trial court and social service agency, and said both "are to be commended for their efforts" in establishing a "thoughtful program for rehabilitation of the family unit."
It is noted, however, that in In re S.D., Jr., M.D., A.D., and I.D., and In re B.J., supra, where a rehabilitation plan was also established, the parties involved  the natural parents or parent, the Division of Family and Children Services or the State, and the guardian ad litem or the foster parents  all stipulated to the development of such plans. While we do not hold that a rehabilitation program may not be established unless the parties stipulate to it, the foregoing cases do illustrate that a rehabilitation program is not a common practice in *1133 the trial courts absent approval by a representative of the State.
In the case at bar both the State and the guardian ad litem opposed the plan suggested by Mr. T. The trial court observed that in the past, the appellant, by failing to seek assistance, had made such a plan impossible. It then refused to grant the request on the ground that the child had been without parents long enough and should be in foster care or put up for adoption.
Trial courts in Alaska are permitted broad discretion in custody disputes.[21] That discretion is based on the realization that the trial judge has the opportunity to assess the character and veracity of the witnesses. Since this is not an ordinary custody dispute, but rather involves termination of parental rights, the trial court's discretion is less broad. Nevertheless the termination of parental rights does involve an assessment of a parent's ability to fulfill his or her parental responsibilities which is similar to that required by an ordinary custody dispute. The trial court is in a unique position to judge the strength of the parent's interest in the child, the likelihood of the success of any rehabilitation plan, and the effect that such a plan might have on the child.
Mr. T. had almost no contact with his son, the child's natural mother, the Division of Social Services or his probation officer for almost three years prior to the termination hearing. It could not be predicted how long it would be before Mr. T. would be able to provide a home for E.J. (T.). Evidence was introduced at the hearing which tended to show that a stable home for E.J.(T.) was needed immediately for his well-being, and the State, through foster care or adoption, was more likely to be able to provide such a home for E.J. (T.) than was Mr. T.
We have reviewed appellant's claim that the trial court improperly gave priority to the rights of the child over those of the parent and find it to be without merit.[22]
The decision of the trial court is AFFIRMED.
NOTES
[1] AS 47.10.080(c)(3)(B) provides:

(c) If the court finds that the minor is dependent, it shall
.....
(3) by order, terminate parental rights and responsibilities of one or both parents and commit the child to the department or to a legally appointed guardian of the person of the child, if one of the following conditions exists:
.....
(B) the child has been abandoned for a period of not less than six months by
(i) both parents, or
(ii) the surviving parent, or
(iii) one parent if the other has been deprived of custody and visitation rights;
.....
[2] AS 47.10.080(c)(3)(D) provides in pertinent part:

(c) If the court finds that the minor is dependent, it shall
.....
(3) by order, terminate parental rights and responsibilities ... if one of the following conditions exist:
.....
(D) each parent ... has demonstrated by his conduct, proven by clear and convincing proof amounting to more than a preponderance of the evidence that he is unfit to continue to exercise his parental rights and responsibilities. (emphasis added)
The section under which Mr. T. was declared to have abandoned his child is AS 47.10.080 (c)(3)(B). See note 1, supra.
In In re Adoption of K.S., 543 P.2d 1191, 1194-1195 (Alaska 1975), this court, relying on AS 47.10.080(c)(3)(D), required the "clear and convincing proof" standard in determining parental unfitness in an adoption case. Since there, as in the case at bar, the proceedings were to determine whether parental rights were to be terminated, the standard of proof must be the same.
[3] In re S.D., Jr., M.D., A.D. and I.D., 549 P.2d 1190, 1195 (Alaska 1976).
[4] Id. at 1195, n. 10.
[5] In re D.M. v. State, 515 P.2d 1234, 1237 (Alaska 1973). See also subsequent cases adopting the same definition: In re B.J., 530 P.2d 747, 749 (Alaska 1975); In re Adoption of V.M.C., 528 P.2d 788, 792 (Alaska 1974); In re Adoption of A.J.N., 525 P.2d 520, 523 (Alaska 1974).
[6] See note 2, supra.
[7] In re Adoption of V.M.C., 528 P.2d 788, 794 n. 8 (Alaska 1974).
[8] Appellant's Brief at 15, citing Transcript at 71.
[9] In re D.M. v. State, 515 P.2d 1234, 1237 (Alaska 1973).
[10] In re Adoption of V.M.C., 528 P.2d 788, 793 (Alaska 1974).
[11] In re D.M. v. State, 515 P.2d 1234, 1236-1237 (Alaska 1973).
[12] 528 P.2d 788 (Alaska 1974).
[13] Id. at 789-793. After his wife died in childbirth, the father in V.M.C. allowed his parents to take his newborn child from Tacoma, Washington, to Fairbanks until he was settled. After four months, the father came to Fairbanks to take his child home but was falsely told by his parents that a court order had been issued preventing him from doing so. The father returned to Fairbanks a month later. This time his father physically prevented him from taking his child back to Tacoma. He was told that the matter was in the hands of the court.

During the next four years, the father obtained regular employment, was married, and sent birthday and Christmas gifts to his child. He also enlisted the assistance of his brothers and sisters to regain his child. A heated family controversy ensued. When all else failed, the father refused to accept treatment for his cancer unless the child was returned to him. When his parents refused to return the child, the father urged his brother and sister to steal the child and fly him to Tacoma, which they did. A re-kidnapping by his parents followed, and numerous court proceedings shortly thereafter resulted in a return of the child to the natural father.
The horrendous conduct of the grandparents and the obvious determination of the father to regain his child are a far cry from the facts of the instant case where a child spent 19 months in the custody of the State, waiting for his father, who lived in the same town, to express any sort of interest in him.
[14] Appellant asserts that the delay in visiting his son was caused by his own hesitancy to see his son in his circumstances at that time: he and his fiancee did not have their own home and were not working; he was embarrassed and ashamed about not being ready to try to get his son back. At the time of the hearing it was the opinion of appellant's counsel that Mr. T. was still not able to provide a home for his son. In this respect the case at bar is quite similar to In re B.J., 530 P.2d 747, 750 (Alaska 1975). There we denied the father the custody of the child and observed:

As in D.M., the daughter has been cared for exclusively by foster parents for most of her life, eight of eleven years at the time of the trial. The father during all that time was unable to acquire a suitable home for his children or to show that he was able to care for them. In fact, at the hearing, he admitted that he still was not in a position to care for his children.
[15] In re D.M. v. State, 515 P.2d 1234, 1236 (Alaska 1973).
[16] Id. at 1237. See also In re B.J., 530 P.2d 747, 749 (Alaska 1975); In re Adoption of V.M.C., 528 P.2d 788, 792 (Alaska 1974); In re Adoption of A.J.N., 525 P.2d 520, 523 (Alaska 1974).
[17] In re D.M. v. State, 515 P.2d 1234, 1237 (Alaska 1973).
[18] 530 P.2d 747 (Alaska 1975).
[19] 549 P.2d 1190 (Alaska 1976).
[20] Id. at 1202.
[21] Carle v. Carle, 503 P.2d 1050, 1052 (Alaska 1972).
[22] Appellant contends that the trial court elevated E.J. (T.)'s right to have parents to a position superior to Mr. T.'s right to have custody of his child. Appellant asserts that this approach misstates the law in this state.

The cases in which this court has given natural parents custody have involved natural parents who were not unfit and who had not abandoned their children. See Turner v. Pannick, 540 P.2d 1051, 1055 (Alaska 1975); Wilson v. Mitchell, 406 P.2d 4, 7 (Alaska 1965). Here the issue was whether the child had been abandoned. Once the trial court determined that Mr. T. had abandoned E.J. (T.) for the requisite period of time, the best interests of the child were to be considered. See AS 09.55.205. In re Brown's Children, 7 Alaska 411 (1926). Cf. In re D.M. v. State, 515 P.2d 1234 (Alaska 1973).