**NADA A., Appellant and Cross-Appellee,**

v.

**STATE of Alaska, Appellee and Cross-Appellant.**

**Nos. 6546, 6693.**

Supreme Court of Alaska.

Feb. 25, 1983.

John Hagey, Asst. Public Defender, Fairbanks, Dana Fabe, Public Defender, Anchorage, for appellant and cross-appellee.

D. Rebecca Snow, Asst. Atty. Gen., Fairbanks, Wilson L. Condon, Atty. Gen., Juneau, for appellee and cross-appellant.

Before BURKE, C.J., and RABINOWITZ, CONNOR, MATTHEWS and COMPTON, JJ.

## OPINION

CONNOR, Justice.

Nada A. appeals the termination of her parental rights to her son, O.A. At the conclusion of the termination hearing in superior court, the judge found that O.A. was a child in need of aid and that his mother's disregard of her parental obligations was likely to continue. The court ordered the termination of her parental rights, but further ordered that in the event of a change in circumstances, Nada could apply for a reconsideration of the termination at any time before O.A. is adopted. The state cross-appeals this order permitting a reconsideration of the termination.

Nada gave birth to O.A. on June 29, 1978. Her husband, Mohammed, repeatedly battered both his wife and child. In January, 1979, shortly after one of these incidents, Nada shot and killed Mohammed. She was then 17 years old. After the shooting, Nada left Fairbanks with O.A. and went to stay with her sister, Marie Gee, in Washington State. A few days after her arrival, Nada was arrested and charged with first degree murder. She was then incarcerated in a juvenile facility in Washington until she reached age 18. With the exception of a few months spent in temporary foster care, O.A. lived with Marie while Nada was incarcerated. Marie brought O.A. to the prison facility twice weekly for visits with Nada.

After entering a negotiated plea to the charge of manslaughter in Fairbanks, Nada was sentenced in July of 1980. Marie brought O.A. with her to Alaska for the sentencing. After sentencing, Nada was released on appellate bond and O.A. rejoined her.

On October 15, 1980, Nada took O.A. to the babysitter's, packed a few clothes and went to Anchorage to escape mounting personal pressures. Nada did not return to Fairbanks because she feared that she would be put in jail and would be unable to get O.A. back.

Emergency custody of O.A. was assumed by the Division of Family and Youth Services [DFYS] on October 16, 1980. From the last week in October of 1980 until the present, O.A. has remained in the foster care of the L. family.

Nada remained in Anchorage until June 27, 1981, when she voluntarily turned herself in to the authorities. After she was transported back to Fairbanks, Nada tried to make contact with O.A. through the DFYS. Her request was refused, because the DFYS had decided to seek termination of her parental rights. On July 1, 1981, a petition for termination of parental rights was filed by the state. The court found O.A. to be a child in need of aid as a result of physical abandonment under AS 47.10.-010(a)(2)(A). It then had authority under AS 47.10.080(c)(3) to terminate Nada's parental rights upon a showing, by clear and convincing evidence, that parental conduct leading to the "child in need of aid" determination was likely to continue.[1] The order terminating Nada A.'s parental rights was signed on January 11, 1982. This appeal followed. Adoption proceedings have been stayed pending disposition of the appeal.

## I. ABANDONMENT

Nada argues that the trial court erred in its finding of "physical abandonment." She claims that the trial court applied an incorrect legal standard in reaching this determination. Specifically, Nada alleges that the court relied on the subjective viewpoint of the child rather than on an objective standard. She contends that a proper application of the abandonment test would result in a finding that her conduct did not evidence a disregard of her parental obligations.

In *D.M. v. State*, 515 P.2d 1234 (Alaska 1973), in rejecting the application of a subjective standard to measure a parent's intention to abandon a child, we stated:

"Whether or not there has been an abandonment within the meaning of the statute is to be determined objectively, taking into account not only the verbal expressions of the natural parents but their conduct as parents as well."

---

1. AS 47.10.080(c)(3) provides:
   "(c) If the court finds that the minor is a child in need of aid, it shall

   . . . . .

   (3) by order, upon a showing in the adjudication by clear and convincing evidence that there is a child in need of aid under AS 47.10.010(a)(2) as a result of parental conduct and upon a showing in the disposition by clear and convincing evidence that the parental conduct is likely to continue to exist if there is no termination of parental rights, terminate parental rights and responsibilities of one or both parents and commit the child to the department or to a legally appointed guardian of the person of the child, and the department or guardian shall report annually to the court on efforts being made to find a permanent placement for the child."

515 P.2d at 1236–37. We have followed this standard consistently. *See In re E.J.(T.),* 557 P.2d 1128, 1131 (Alaska 1976); *In re B.J.,* 530 P.2d 747, 748–49 (Alaska 1975); *In re Adoption of V.M.C.,* 528 P.2d 788, 793 (Alaska 1974); *In re Adoption of A.J.N.,* 525 P.2d 520, 523 (Alaska 1974); *D.M. v. State,* 515 P.2d 1234, 1236–37 (Alaska 1973). We agree with the state's view that the court properly found the existence of a physical abandonment under the objective standard.

■ The test for abandonment has two prongs: (1) has the parent's conduct evidenced a disregard for his or her parental obligations, and (2) has that disregard led to the destruction of the parent-child relationship. *Adoption of V.M.C.,* 528 P.2d 788, 793 (Alaska 1974). A review of the record indicates that the court had before it sufficient objective evidence to satisfy the first prong of the abandonment test. The testimony about how Nada had fled from Fairbanks leaving O.A. with a babysitter provides sufficient objective evidence indicating disregard of parental obligations. In addition, at the hearing, the trial judge specifically referred to the eight month period of separation during which Nada lived in Anchorage as "for all practical purposes destr[oying] the parent/child relationship." Therefore, the trial court properly applied the legal standard and its finding of abandonment should not be reversed.

Nada also argues that the trial court erred by considering her incarceration as abandonment. She contends that in order to constitute abandonment, the acts of the parent must be willful. Yet, incarceration was beyond her control and, she claims, actually resulted from her attempt to protect O.A. from his father.

■ We have said that "[i]n order to constitute abandonment, the acts of the parent must be willful." *In re B.J.,* 530 P.2d 747, 750 n. 12 (Alaska 1975). The trial judge did orally state that he considered involuntary incarceration to constitute abandonment, but the written findings of fact, which were submitted by the state and signed by the court, referred to the voluntary absence from October of 1980 to June of 1981 as the relevant conscious disregard of parental obligations.[2] Consequently, we find no reversible error.

## II. BEST INTERESTS OF THE CHILD

Nada argues that the trial court misinterpreted our previous decisions and incorrectly used the best interests of the child as the sole criterion for its decision to terminate her parental rights. She claims that the best interests of the child should be considered only after it has been shown that there is sufficient parental misconduct to justify termination.

■ The state argues that the best interests of the child are a significant, but not dispositive, consideration at each step in determining whether to terminate parental rights.[3] It claims that the trial court's actions were consistent with the approach we have repeatedly espoused that the best interests of the child are to be considered *only* after a finding of parental unfitness or a determination that the first prong of the abandonment test has been satisfied. *See, e.g., In re Adoption of K.S.,* 543 P.2d 1191, 1195 (Alaska 1975); *In re Adoption of V.M.C.,* 528 P.2d 788, 793 (Alaska 1974); *In re Adoption of A.J.N.,* 525 P.2d 520, 523 (Alaska 1974). While the best interests of the child become relevant at some point, there first must be a showing of parental

**2.** When written findings of fact conflict with an oral statement made by a judge, the written findings are controlling. *Ronne v. Ronne,* 568 P.2d 1021, 1023 n. 5 (Alaska 1977). *See also Williams v. City of Valdez,* 603 P.2d 483, 492 n. 30 (Alaska 1979).

**3.** AS 47.10.082 reads:
"In making its dispositional order under AS 47.10.080(b) the court shall consider the best

interests of the child and public, and in making its dispositional order under AS 47.10.-080(c) the court shall consider the best interests of the child; in either case the court shall consider also the ability of the state to take custody and to care for the child to protect his best interests under AS 47.10.-010–47.10.142."

conduct sufficient to justify termination. *Id.* The trial court's findings clearly show that it was aware that several factors in addition to best interest enter into a termination order. In deciding to terminate Nada's parental rights, the trial court followed the correct procedure. It did not merely compare the merits of the home to be provided by Nada with that of the L. family.

## III. TRIAL COURT'S FINDINGS

Nada argues that the court's finding that her disregard of her parental obligation was likely to continue in the future was clearly erroneous.

AS 47.10.080(c)(3) requires as prerequisites to termination of parental rights that first, the child is a child in need of aid "as a result of parental conduct," and second, clear and convincing evidence that "the parental conduct is likely to continue to exist." The parental conduct relied on by the trial judge in determining that O.A. was a child in need of aid was:

> "That on October 15, 1981, N.A. left her child, O.A., with a babysitter and did not return, thereby exhibiting a conscious disregard for the needs and welfare of her child and of her parental obligations to O.A."

■ According to our reading of the statute, there must then be a showing by clear and convincing evidence that this same conduct is likely to continue. The findings below are deficient in this regard. The only relevant finding is:

> "That N.A. is likely to continue to demonstrate a conscious disregard of the obligation owed by a parent to a child even after her release from incarceration because she suffers from an impulsive personality disorder."

The only testimony upon which the court could have relied in making this finding was rendered by Dr. Rothrock, a psychiatrist who had interviewed Nada only once for one hour, admitted he knew nothing about her parenting abilities and qualified his prognosis with the statement that he could "only answer that question in generalities, because . . . [he had] not had any extended contact with [Nada A.]."

Dr. Rothrock's opinion was not shared by Robert Dunn, a psychological counselor, who offered opposing expert testimony that N.A. had a high probability of success in controlling her problem, nor by the social workers and others who knew Nada well and felt that she had made considerable progress through counseling. Evidence favorable to Nada also included her own testimony as to her willingness to accept help in dealing with her personal problems and in learning to be a better mother.

■ The impulsive personality disorder itself is not conduct and thus, not a ground for termination.

■ Although Nada did abandon O.A. once before, that action was taken under very stressful and unique circumstances. It would, therefore, be unjustified to infer a likelihood of future abandonment from this isolated incident.

In view of the high standard of "clear and convincing evidence" required on the issue of the likelihood that past conduct will continue, we are left "with a definite and firm conviction on the entire record that a mistake has been made, although there may be evidence to support the finding." *In re S.D., Jr. et al,* 549 P.2d 1190, 1195 n. 10 (Alaska 1976).[4]

---

4. Nada also argues that the trial court erred by not considering the effect of the actions of the DFYS on Nada's exercise of her parental rights. She argues that the DFYS frustrated her efforts to communicate with O.A. while it encouraged the foster parents to adopt him, and thus, failed in its obligation to "make reasonable attempts, whenever possible, to preserve and strengthen the family ties." *E.A. v. State,* 623 P.2d 1210, 1213 (Alaska 1981) (footnote omitted), before

terminating her parental rights. Nada's argument is without merit because it focuses on the wrong time frame. Nada was receiving a wide range of social services at the time she abandoned O.A. There is little the DFYS could have added to these services. During the relevant period prior to filing a petition to have Nada's rights terminated, the state did try unsuccessfully to locate her, but could do little to strengthen her family ties while she was gone.

## IV. CROSS-APPEAL

In its cross-appeal, the state challenges the trial court's giving Nada leave to seek reconsideration of its termination order until the entry of a final adoption decree. It claims that this order represents a violation of O.A.'s equal protection rights. The state claims that the issuance of a termination order overcomes the statutory presumption in favor of a natural parent's fitness and urges that *Rita T. v. State,* 623 P.2d 344 (Alaska 1981), which undermines finality by resurrecting this preference, be modified or overruled so that the best interests of the child (as determined in a neutral adoption process), rather than parental rehabilitation alone, will be the relevant criterion.[5] In *Rita T.,* we interpreted AS 47.10.-080(f) to permit any natural parent to stay adoption proceedings upon a showing of good cause. "Good cause" was defined as a showing that "it would be in the best interests of the child to resume living with [the parents] because they have sufficiently rehabilitated themselves so that they can provide proper guidance and care for the child." 623 P.2d at 347. We adhere to this position. Termination of parental rights is a drastic measure resulting in severance of all legal ties between the child and parent. The revocability of termination orders up until the time of adoption is a necessary compromise between the desire for finality and the desire to avoid unnecessary interference by the state in the natural parent-child relationship. *Rita T.* recognizes, and seeks to accommodate, the inherent potential for fallibility in judicial determinations based upon predictions of human behavior with respect to the likelihood of continued parental misconduct. The subsequent review of termination orders permitted by that decision cannot be said to deny equal

protection to O.A. and to other children similarly situated who are awaiting adoption.

In conclusion, we find, first, that the record contains insufficient evidence to support the termination of Nada A.'s parental rights. Second, the preservation of her right to obtain reconsideration upon a showing of good cause prior to the adoption of O.A., challenged in the cross-appeal, was proper.

The decision below is REVERSED.

COMPTON, Justice, concurring.

I concur in the disposition of this appeal, but write separately to express my opinion that the legislature should amend AS 47.-10.080(c)(3) so that a parent's incarceration may be considered when determining whether to terminate parental rights.

AS 47.10.080(c)(3) specifies that parental rights may be terminated only if there is a showing "by clear and convincing evidence that there is a child in need of aid under AS 47.10.010(a)(2) as a result of parental conduct." It seems obvious to me that a child may be in need of aid when the only custodial parent engages in conduct that results in incarceration. I would therefore conclude that AS 47.10.080(c)(3) permits the superior court to consider the parent's incarceration when determining whether the child is in need of aid; *e.g.,* whether the parent has abandoned the child.

AS 47.10.080(c)(3) also requires, however, a showing "by clear and convincing evidence that the parental conduct is likely to continue to exist if there is no termination of parental rights." Although incarceration may well be likely to continue for a substantial period of time, and the child will

---

After she returned, the agency merely implemented its sound desire to avoid disruptive contacts while a judicial resolution of the matter was pending. The cases of agency misconduct cited by Nada are inapposite because in each of those situations the location of the parent was known. We also find Nada's claim of discriminatory enforcement of the termination statute to be without merit.

**5.** The state bases its constitutional argument on O.A.'s right to a permanent, adequate home. *See, In re S.D., Jr.,* 549 P.2d 1190, 1201 (Alaska 1976). Since this right has not been recognized as "fundamental", any difference between the treatment of children in O.A.'s position whose natural parents seek reconsideration and that of other children whose parents' rights have been terminated need only satisfy a reasonable basis test.

therefore continue to be in need of aid, involuntary incarceration is not willful "parental conduct." I therefore conclude that AS 47.10.080(c)(3), by its express terms, does not permit the superior court to consider the custodial parent's incarceration when determining whether to terminate parental rights.

The situation is easily imaginable in which the only parent with custody of a child commits a crime and is sentenced to a lengthy imprisonment term when the child is quite young. This may effectively destroy the parent-child relationship. Under these circumstances, the child should be permitted to establish a bond with other persons, rather than spend his or her minority in a succession of foster homes or other temporary placements. AS 47.10.080(c)(3), as presently written, however, does not permit the termination of parental rights in this situation. I urge the legislature to consider the effect of the statute's wording and amend it so that this result is not necessary.

In this case, the superior court indicated in its oral findings of fact that it considered Nada's incarceration to constitute an abandonment of O.A. Nada contends that her incarceration is beyond her control and therefore may not be considered as the "willful conduct" necessary to constitute abandonment in accordance with our holding in *In re B.J.*, 530 P.2d 747, 750 n. 12 (Alaska 1975). This court impliedly agrees with Nada by holding that the superior court did not commit reversible error on this issue because Nada's incarceration was not relied upon in the written findings of fact, which are controlling. 660 P.2d at 439 & n. 2. I disagree with this court's implied holding.

Very few people are voluntarily incarcerated. It is also true, however, that very few people are incarcerated for involuntary acts. It should be entirely foreseeable to a parent that commission of a crime will result in incarceration and separation from the parent's child. Whether this amounts to an abandonment of the child may depend upon whether the parent is able to and does make adequate provisions for the child's care during the length of the parent's incarceration. *See, e.g., Diernfeld v. People*, 137 Colo. 238, 323 P.2d 628 (Colo.1958); Annot., 79 A.L.R.3d 417 (1977) ("Parent's Involuntary Confinement . . . as Evincing Neglect . . . in Dependency or Divestiture Proceeding").

Nada did not make any provisions for the care of O.A. before her incarceration. She left O.A. with a babysitter, even though her stepmother lived in Fairbanks and had earlier taken care of her and O.A. Nada's incarceration may have been beyond her control, but her conduct in killing her husband was within her control, according to the superior court that found her guilty of manslaughter and sentenced her to a term of imprisonment. Furthermore, her failure to make any provisions for the care of O.A. during her incarceration was also within her control. I believe that these facts constitute clear and convincing evidence that Nada abandoned O.A.

As indicated, however, Nada's incarceration is not "parental *conduct*" that is "likely to continue to exist if there is no termination of parental rights." AS 47.10.-080(c)(3). Thus, under the statute, her incarceration cannot justify the termination of her parental rights. I agree with this court that the evidence of Nada's impulsive personality disorder is not in itself grounds for terminating her parental rights. I also agree with this court that clear and convincing evidence was not presented that Nada is likely to abandon O.A. again after she is released from prison. Thus, I find I must concur with the court that it is necessary to reverse the superior court's order terminating Nada's parental rights. Again, however, I urge the legislature to amend AS 47.10.080(c)(3) so that parental rights may be terminated when a parent destroys the parent-child relationship by willfully committing a crime and failing to make adequate provisions for the care of the child during a period of incarceration. Under some circumstances, only in this fashion may the child be permitted to form a bond with other persons and avoid a succession of

foster home placements or other unsatisfactory temporary placements during the entire duration of the child's minority.