OPINION OF THE COURT
Lawrence E. Kahn, J.
In this proceeding, petitioner father seeks custody of his infant daughter Rachel, who was born out of wedlock on October 10, 1978. Respondent mother has cross-petitioned for custody. Rachel is presently in the care of foster parents, having been placed there by respondent on November 27, 1978 for the purpose of having the child adopted through Catholic Charities of the Diocese of Albany. When petitioner appeared at the proposed adoption proceeding and indicated his intention to oppose the adoption and seek custody of his child, respondent withdrew her proposed surrender for adoption and instead elected to oppose petitioner’s efforts to obtain custody with her own petition for the return of Rachel to her custody. There is no issue as to paternity in that respondent has acknowledged that petitioner is the father of Rachel.
It is crucial at the outset of this proceeding to ascertain precisely the status of the law of the State of New York so that it may be applied to the unique facts herein. Prior to this hearing, this court rendered a decision on March 14, 1979 wherein the court determined the law to be applied in awarding custody as between the unwed father and prospective adoptive parents. The court then held that as between the natural father and third persons, custody would be awarded to the father if he was found to be a fit and proper parent. (See, also, Matter of Bennett v Jeffreys, 40 NY2d 543.) The issue now before the court concerns the constitutionality of the law in a custody proceeding between parents of a child born out of wedlock.
During the pendency of this proceeding, the United States Supreme Court handed down Caban v Mohammed (441 US —; 47 USLW 4462). In that case, the court discussed the rights of an unwed father and declared section 111 of the New York State Domestic Relations Law unconstitutional insofar as it allowed a natural mother of an illegitimate child to veto absolutely, any adoption of said child, while at the same time denying such rights to the father. While the holding in that case specifically dealt with an adoption proceeding, the court’s *929 standard to test the constitutionality of "gender-based distinctions” was clearly stated. The court said that such distinctions "must serve government objectives and must be substantially related to achievement of those objectives in order to withstand judicial scrutiny under the Equal Protection Clause.” (Caban, supra, p —.) Caban is but another in a series of cases wherein the United States Supreme Court has repeatedly recognized and broadened the rights of unwed fathers in their attempts to secure rights heretofore reserved for fathers of children born with the blessings of a marriage license. (See Stanley v Illinois, 405 US 645, and Quilloin v Walcott, 434 US 246.) The court in Caban ended its majority opinion by stating that (p —): "[Section] 111 is another example of 'overbroad generalizations’ in gender based classifications. * * * The effect of New York’s classification is to discriminate against unwed fathers even when their identity is known and they have manifested a significant parental interest in the child. The facts of this case illustrate the harshness of classifying unwed fathers as being invariably less qualified and entitled than mothers to exercise a concerned judgment as to the fate of their children.”
This court must view the facts of the case at bar in light of the United States Supreme Court’s continuing trend to expand the rights of unwed fathers. This expansion must be reconciled with the statutes and case law of this State as they have been enacted and interpreted.
Section 70 of the Domestic Relations Law provides in pertinent part that: "In all cases there shall be no prima facie right to custody of the child in either parent”. Section 70 is significant in that it formerly provided for no prima facie right to the custody of the child of either "spouse”. This section was amended to substitute the term "parent” for "spouse”, thereby removing the distinction between married and unmarried parents.
However, without addressing the constitutional issue, the appellate courts of this State have held that section 70 is applicable only to the custody of children born in wedlock. In the case of Matter of Barry W. v Barbara K. (55 AD2d 607), the court stated that: "Prima facie, the mother of an illegitimate child is entitled to its custody and, when she is a proper and suitable person, the court will award custody to her as against the father, or anyone else.” A similar decision was reached in Matter of Loretta Z. v Clinton A. (36 AD2d 995).
*930 This court must review these cases in light of the constitutional guidelines set forth by recent United States Supreme Court decisions which expand the rights of unwed fathers.
The most significant single factor adduced at the trial is the mother’s repeated testimony that she would place the child out for adoption if permitted. Coupled with this is the father’s long-standing and continual efforts to seek custody of his child. We therefore have a situation where custody is being decided between a parent who wishes to assume the role of custodial parent and one who espouses the belief that placing the child up for adoption with nonparents would be the best alternative. This situation severely tests the constitutionality and rationale of prior case law which interprets section 70 to be. inapplicable to unwed parents. The facts as adduced at this trial fall squarely within the guidelines set forth in Caban v Mohammed (supra). To hold that the unwed mother has a prima facie right to custody over the father denies equal protection of law to the father and irrationally prevents the court from doing what is best for the child. Such a gender-based approach could also do irreparable harm to unwed fathers who might otherwise be encouraged to take an active role in the rearing of their offspring. Rather than advance governmental objectives, that interpretation of section 70 would have the opposite effect and would discourage the support and parenting of an out-of-wedlock child by the father. This court therefore holds that on the facts before it, section 70 applies to unwed as well as wed parents. Further, even if this court were to uphold the constitutionality of a gender-based distinction between unwed parents, any prima facie right to custody in the case at bar has been negated by the mother’s conduct vis-á-vis the proposed adoption. Her actions constitute extraordinary circumstances, thereby invoking the "best interests of the child” test.
Accordingly, the issue of custody in this case will be determined without any artificial gender-based distinctions. The best interest of the child and not the sex of a parent will guide the court in its determination of custody.
In reaching its decision, this court makes the following findings of fact:
Petitioner and respondent began dating and entered into a serious relationship in the summer of 1977. In February of 1978, respondent became pregnant. Both petitioner and respondent discussed all aspects of the pregnancy with each *931 other and their families. Initially, petitioner, who was very much in love with respondent, wished to marry her. Respondent on the other hand had decided that marriage was not a viable option for her and thus rejected this alternative. Respondent believed that giving up the child for adoption would be the best solution. Petitioner believed that the child should not be placed out for adoption but should be kept in the care and custody of either respondent or himself. When it became clear to petitioner that he was no longer loved by respondent and that marriage was out of the question, he turned his main attention toward maintaining a relationship with respondent to retain his rights as the father of their unborn child. Both parties consulted legal counsel prior to the birth of their child. As soon as Rachel was born, petitioner brought a petition for visitation rights in the Family Court in Denver, Colorado, where the parties resided.
When it appeared that petitioner would pursue his legal rights to be with and visit Rachel, respondent left Colorado and came to Albany, New York, where she placed her child for adoption with the Catholic Charities of the Diocese of Albany on November 27, 1978. Since that date, the infant has resided with foster parents selected by the agency. Thereafter, petitioner traveled to this State and again asserted his rights as father of the child and objected to any proposed adoption. When it appeared that Rachel’s father was determined to seek custody, respondent withdrew her proposed surrender and requested Rachel’s return.
In reaching its findings of facts, this court has given no evidentiary weight to inferences as to the ulterior motives of both parents. Such speculation has not been sustained by competent proof. The court finds that both petitioner and respondent are each sincere in their actions and that each believes that they want what is best for Rachel.
This court has weighed all of the evidence adduced at trial, as well as all exhibits admitted into evidence, and based upon all of such proof, the court finds that it is in the best interest of Rachel to be in the care and custody of her father. After evaluating all of the evidence, it becomes clear that the father has continually and consistently sought custody of Rachel and has been anxiously willing, able and ready to assume the full responsibility of parenting his daughter. At the same time, the mother has continually and consistently sought to place Rachel up for adoption and has not been *932 willing or ready to assume parental responsibilities. While she is now willing and desirous to have custody of Rachel, her testimony concedes that she still believes that adoption remains the best option for Rachel and that she would not be seeking custody if the father had not asserted his rights. The court finds that the mother is not ready to assume parental responsibilities, while the father is. This conclusion is further supported by psychological proof before the court. While all three medical experts found both mother and father "normal” individuals, the only expert psychologist who examined both parents found that the father "clearly has the personal resources to respond to a child’s needs for support, affection, stimulation, guidance and restraint. Furthermore, he is flexible enough to respond to the changing needs of a growing child. He would make a good father and fine role model.” As to the mother, the same psychologist stated that: "I don’t think she is ready for a lasting commitment, particularly one that would require her to be nurturant in a demanding or restricting fashion. While there is no question that she loves her baby and wants the best for her, I don’t think she is ready to devote herself to being a mother.” This court concurs with these clinical and psychological findings. Such evidence is supported by the overwhelming proof which shows a father desperately reaching out to keep his child and a mother determined to place the child out for adoption. From before birth when the father retained legal counsel to obtain his parental rights, through the day of her birth when the father appeared at the hospital and cradled his newborn daughter in his arms and thereafter when he crossed a continent in search of Rachel, who was by then placed in the hands of strangers by an adoption agency, this father clearly wanted to assume and enjoy the responsibilities and obligations of fatherhood. The mother was not ready to assume such parental duties.
This court does not treat lightly the mother’s decision to give Rachel up for adoption, but such a decision is not within her option without the concurrence of the father. (See Caban v Mohammed, supra.) A child is born to two parents and both have natural rights to said child. Duties and obligations attach to all rights, and in this case, the father’s rights are properly protected because of his consistent desire to meet his duties and obligations. Courts have always vigorously pursued an unwed father to fulfill his obligation of support and it would be inconsistent and inequitable not to legally recognize the rights of such a father who vigorously seeks custody.
*933 Two other factors which aided the court in reaching its determination were the attitudes of the parents regarding visitation and the immediate living plans proposed by each parent.
The mother, in seeking custody, preferred no visitation by the father, as she perceived that it would be disruptive to Rachel. The father believed that visitation could work and would encourage as much visitation as possible. While visitation is not an ideal exercise of parental rights, it is obviously a very real part of American contemporary family life. The mother, rather consistently expresses her displeasure at single-parent home life and visitation by the noncustodial parent, but her situation dictates no other alternative. Rachel is entitled to receive the parental love, security and upbringing that any child is entitled to and reality dictates that she be raised in a single-parent home. With the great increase of divorce, such a prospect is not unusual nor will it necessarily detract from Rachel’s healthy happy upbringing. The mother’s two preferred solutions, adoption or custody without visitation, would not be in Rachel’s best interest and reflect the mother’s inability to accept her life circumstances, namely, a child born to her out of wedlock, to a father who wants their child. She cannot exclusively control the situation created by a relationship she voluntarily entered into even if she resents the tie she must maintain with a man she no longer loves. She feels no differently than thousands of divorced people who must accept the fact that a child will, in that one respect, always keep a bond between parents. The difference herein is the fact that there was no marriage between the parents; thus no commitment to share their whole life together. Such a distinction is a real one but the public policy of our State while not encouraging such nonmarital relationships nor out-of-wedlock children, does encourage that an illegitimate child not be abandoned by a natural parent. The public policy of our State strongly supports parental responsibility and seeks to protect and support family ties, either whole or splintered, married or unmarried.
Finally, the court believes that the home life offered Rachel by the father provides the best hope for Rachel’s security and stability. The father would live with his parents while working and attending college and would receive their supportive help. The mother would live with a single-parent roommate while she attends college and works. The court believes that *934 the father’s proposed living situation is more conducive to Rachel’s best welfare at this time.
While the mother indicated her unwillingness to visit Rachel if the father was awarded custody, the court will nevertheless award her visitation rights in the hope that she will come to accept the reality of her situation and desire to maintain a tie to her daughter. Accordingly, the mother is awarded reasonable and liberal visitation rights at times mutually agreed to between the parents.