OPINION OF THE COURT
Elrich A. Eastman, J.
Petitioner, Alberto B., Sr., instituted this proceeding to establish his paternity of the infant, Alberto B., Jr., and to acquire permanent custody of the said infant. On December 8, 1978, an order of filiation was entered.
Thus, the sole issue before this court is the petitioner’s request for permanent custody of Alberto, Jr.
*148 Reviewing the testimony of the parties, the following facts are established:
Petitioner, Alberto B., Sr., age 26, met respondent Rosa O., age 28, in August, 1968 and thereafter they began living together until March, 1977. As a result of this liaison, their son, Alberto, Jr., was born on February 9, 1973. During their relationship both of them became deeply involved in drugs. The petitioner voluntarily entered Horizon House, a drug rehabilitation program, and 18 months later became drug free. Petitioner then persuaded the respondent to enter a methadone program in 1972, and she has continued in a methadone maintenance program since that time. She currently attends the Beth Israel Methadone Maintenance Treatment Program three times a week.
Since "kicking the habit,” the petitioner has been employed for the past two years as a security guard. He states that he resides with his mother. Respondent disputes this statement and claims that petitioner is living with a girlfriend. Respondent has been unemployed since 1970 and is on public assistance. Both parties have other children born out of wedlock. Respondent has a daughter, Lashming M., 10 years old, who resides with her. Petitioner has a three-year-old son, and he is unaware of the whereabouts of either the mother or his son.
The facts surrounding their separation are disputed by each party. Respondent claims that they separated as a result of petitioner’s constant beating and attempting to strangle her, coupled with his persistent infidelity. Petitioner claims the separation occurred because of a fight over the care of the child. Nevertheless, after the separation, the child remained in the mother’s custody. At the time, both parties resided in the home of the maternal grandparents. In June, 1977, the petitioner took the child to his mother’s home and kept him there until September, 1977, when he allowed the respondent to take the child for a period of two weeks. After the return of the child to the paternal grandmother, the infant remained with the paternal grandmother until November, 1978, when the respondent took the child away and kept him for five days before the petitioner took the child again. He has had the child ever since.
The report and argument of the Society for the Prevention of Cruelty to Children (SPCC) and the Mental Health Services report of Dr. Jerome H. Kessel, psychiatrist, recommend that custody of this infant remain with the father and the paternal *149 grandmother, the de facto surrogate mother. In reaching their recommendation, it appears that heavy reliance was placed upon the respondent’s long-term methadone maintenance condition. Also noted was respondent’s lack of aggressiveness in seeking to recover or maintain custody as indicative of a lack of responsibility. Credence was given to the petitioner’s claim of being drug free, a fact hotly disputed by respondent who claimed to have seen him recently under the influence of drugs. Both reports also interpret the disputed infrequent visitation by the respondent as a lack of interest in her son. Neither report, however, states affirmatively that either party is an unfit parent or that the infant would be in any danger if placed in the custody of the mother.
In an in camera interview with the infant, he expressed to the court a preference for staying with his father while concurrently expressing a desire to see his mother more often. The preference stated by this child of tender years, however, is not binding upon the court. (Dintruff v McGreevy, 34 NY2d 887.)
Historically, a mother of a child born out of wedlock had a prima facie right to custody of that child. (10 Am Jur 2d, Bastards, § 60; 16 NY Jur, Domestic Relations, § 476; People ex rel. Meredith v Meredith, 272 App Div 79; Matter of Anonymous, 12 Misc 2d 211; Matter of Cornell v Hartley, 54 Misc 2d 732.) However, newly emerging case law has rejected this former rule in favor of custodial determinations based solely upon the best interests of the child. (Matter of Domingo T. v Milagros A., NYLJ, Sept. 17, 1979, p 14, col 2; Matter of Boatwright v Otero, 91 Misc 2d 653; Matter of Anonymous, 97 Misc 2d 927.) This view has been reinforced by the increasing recognition by the United States Supreme Court of the rights of putative fathers to participate in the lives of their children born out of wedlock. (Stanley v Illinois, 405 US 645; Quilloin v Walcott, 434 US 246; Caban v Mohammed, 441 US 380.)
The erstwhile dual standard of custody determinations of children born in and out of wedlock, for the most part, has been abolished. The mandate of section 70 of the Domestic Relations Law is applicable in all custody cases. Section 70 states in relevant part: "In all cases there shall be no prima facie right to the custody of the child in either parent, but the court shall determine solely what is for the best interest of the child, and what will best promote its welfare and happiness, and make award accordingly.” (See, also, Matter of Ben *150 nett v Jeffreys, 40 NY2d 543; Matter of Wout v Wout, 32 AD2d 709; Lockwood v Jagiello, 24 AD2d 544.) This doctrine becomes controlling in custody proceedings, particularly where neither party is deemed unfit.
To determine the best interests of this child, the court must look to the circumstances of both parties and the ability of each to provide the love and affection in addition to the care and the maintenance needed for the effective development of the child. An integral part of the psychological growth of the child is his perception of the role models established for him. Indeed, if the custodian has in fact become a "psychological parent”, then removal can be a traumatic event. Here, however, there is no testimony that such an event has occurred. Moreover, the child has lived the major part of his formative years with his mother. Even after the separation of his parents, he continued to live with his mother except during the periods that his father removed him from her. Although there are allegations of neglect made by the petitioner, there is no corroborating evidence. Furthermore, the respondent has custody of her daughter, now 10 years old, without any apparent adverse effect upon the child.
A prime consideration in this case is how respondent’s methadone maintenance treatment impacts upon her parenting capabilities and the best interests of this child. Her methadone maintenance is in juxtaposition to petitioner’s drug-free status.
At the outset, the court takes cognizance of the contrasting methadone treatment approaches. Some authorities advocate the "high dose” approach with emphasis placed on the patient’s ability to function in society, not on his ability to become drug free. Other authorities advocate a "low dose” approach with strong emphasis placed upon the patient’s becoming drug free. Respondent is enrolled at the Beth Israel Methadone Center which subscribes to the former treatment approach. Thus, the conclusion of the court psychiatrist that "[w]ere she responsible she would either be off methadone by now or would be embarking on a detoxification program which she is not” is erroneous.
A perusal of the literature dealing with methadone maintenance patients leads this court to conclude that long-term methádone maintenance treatment is not a detriment to a patient. In the informative pamphlet entitled "Methadone Maintenance Treatment Program — An Overview”, prepared *151 by the Beth Israel Medical Center, it is noted that: “Although detoxification from methadone may become part of a patient’s treatment, it is not a universally achievable — or appropriate— objective for everyone.” In a 1975 report prepared by the Community Service Society, its Committee on Youth and Correction observed at page 5: “The available, albeit meager evidence suggests that successful withdrawal from methadone to enduring abstinence is not common; hence it is possible that methadone maintenance may be a prolonged or even a lifetime procedure for some.” Later in its report (supra, p 45), the committee notes: "An important feature of methadone maintenance treatment is that the individual may remain a patient for many years and conceivably for a lifetime. A growing number of persons have spent years in treatment and are living a normal life in all respects except for needing a daily dose of methadone.” (See, also, Newman, Methadone Treatment in Narcotic Addiction, p 158 [1977].)
The Federal District Court, in Beazer v New York City Tr. Auth. (399 F Supp 1032, 1043, affd 558 F2d 97, revd 440 US 568) considering the employability of a methadone maintenance patient, declared: “The overwhelming weight of the evidence is to the effect that a methadone maintenance patient can perform normally, and that undesirable side effects are lacking.” In accord with this view is an observation contained in the Community Service Society report (p 5): "After stabilization, a process by which tolerance is built up through daily incremental doses of methadone to an amount sufficient to relieve narcotic craving and neutralize the effect of heroin, he [a methadone maintenance patient] is able to function normally. Physiological and behavioral testing has failed to reveal any significant differences in performance between methadone patients and drug free persons * * * No harmful side effects have been observed when methadone is properly prescribed.” The Rehabilitation Act of 1973, as amended in 1978, prohibits job discrimination by employers against a patient in a methadone maintenance facility who is in all other respects qualified for the job. (US Code, tit 29, § 701 et seq.)
With respect to parenting, Avram Goldstein, in his article entitled “Heroin Addiction and the Role of Methadone in Its Treatment” (Archives of General Psychiatry, vol 26, pp 291-300 [1972]), writes: "The proportion of women who are functioning as homemakers effectively is greater the longer they *152 are on methadone maintenance.” In a custody case involving two parents in a methadone maintenance program seeking to recover custody of their child from a third party, the Family Court, Kings County, even though immediate custody was denied, opined: "we feel that the parents should be encouraged to continue making progress and that there should be a return of the child within a reasonably short period.” (Matter of Catherine S., 74 Misc 2d 154, 162.)
Here an award of custody to the petitioner, who ostensibly resides with his mother, would be tantamount to an award of custody to the paternal grandmother. The paternal grandmother did not testify at the hearing. Generally, the courts have frowned upon such an award unless clearly dictated by the best interests of the child. (Matter of Leslie L., 75 Misc 2d 305; Salk v Salk, 89 Misc 2d 883, 887-888, and cases cited therein.) There is no evidence here to indicate that the best interests of this child justify such action. To the contrary, an award of custody to the petitioner would result in the separation of siblings — a result antithetical to manifold judicial findings that it is beneficial for siblings to be reared together. Courts are reluctant to separate siblings unless clearly demonstrated by the circumstances of the case. (Salk v Salk, supra, pp 889-890.) No such necessity has been demonstrated by the evidence in this case.
By reason of the foregoing analysis, the court finds that the best interests of this child dictate that custody be awarded to the mother, the respondent. Petitioner is directed to return the child to the respondent within 15 days of the date of this order.
The petitioner should continue to foster a meaningful relationship with his son and he is granted liberal visitation rights. The terms of such visitation are to be agreed upon between the parties through their attorneys.
The court requests that the SPCC continue to provide counseling and assistance to the parties and to submit a report to the court on the status of the child’s adjustment after 90 days from the date hereof.
In view of the relieving of the 18B counsel assigned to the respondent, this matter is recalendared for November 30, 1979 for the purpose of assigning counsel to respondent and a hearing on the issue of support.